[No. A041445. First Dist., Div. Two. July 5, 1990.]

Guardianship of the Person and Estate of ETHAN S., a Minor.
WAYNE S. et al., Petitioners and Respondents, v.
LEWIS HEADRICK, as Guardian, etc., Objector and Appellant.

WAYNE S., Plaintiff and Respondent, v.
LEWIS HEADRICK, Defendant and Appellant.

**COUNSEL**

Juliana Drous, under appointment by the Court of Appeal, for Objector and Appellant and for Defendant and Appellant.

Allyce Kimberling for Petitioners and Respondents and for Plaintiff and Respondent.

**OPINION**

**SMITH, J.**—These appeals in consolidated guardianship and parentage proceedings over minor Ethan S. (Ethan) raise issues of a putative father's right to counsel and the paternity presumption of Evidence Code section 621. Lewis Headrick, the boy's guardian and the defendant in an action brought by Wayne S. (Wayne) under the Uniform Parentage Act (UPA) (Civ. Code, § 7000 et seq.), appeals from orders granting Wayne summary judgment and terminating the guardianship. We will affirm both orders.

### BACKGROUND

Since the contentions on appeal center on the summary judgment, we draw the facts mainly from the evidence presented on that motion. Wayne supported his motion with voluminous exhibits, declarations and the records on file. Opposition filed by Headrick did not dispute the facts but relied on the legal effect of the statutory presumption of paternity.

Ethan was born in July 1980, in Fortuna, to Maureen Ellen Greenwald, who was married to and living with Headrick. Two older children, Iris (Greenwald's from a prior relationship) and Ezra Headrick, also lived in the home. However, Headrick was traveling and Greenwald was having an extramarital affair with Wayne in San Francisco when Ethan was conceived. She was sure that Wayne, not Headrick, was the father. With Headrick's acquiescence, she gave Ethan the S. surname, and Wayne consented to being designated the child's father on the birth certificate. Though Ethan lived with Headrick for the first years of his life, Ethan always believed that

Wayne was his father. He called him "dad," called Headrick "Lewis" and considered Iris and Ezra his half-sister and half-brother.

Greenwald and Headrick separated in November 1981. She filed in Humboldt County Superior Court for dissolution a year later, her petition naming Iris and Ezra, but not Ethan, as children of the marriage. Headrick was served and allowed the case to go by default, never objecting to the omission of Ethan in the petition. The dissolution became final in 1983. The interlocutory decree awarded the parties joint legal and physical custody of Iris and Ezra, with no mention of Ethan. Greenwald moved to Australia in 1984 and, except for providing affidavits in support of Wayne, was not involved in the proceedings below. She had ceased being a "primary caretaker" for Ethan in December 1981, soon after the separation, and never sought custody for herself below.

Ethan stayed with Headrick and the two older children in Humboldt County until 1985. During that time, Headrick consistently represented to the county welfare department and others, that Wayne, not he, was Ethan's father. Headrick lived with Jan McAdam until she left in 1984, after having a child by him. Wayne remained friends with Headrick during this time and had visits with Ethan.

In March 1985 Ethan began living with Wayne in the San Francisco apartment where Wayne lived with Jack Haygood, who was Wayne's partner and an old friend of Headrick's. The reason is disputed. According to Wayne, Jan McAdam told him of ongoing child neglect by Headrick.[1] When confronted by Wayne, Headrick admitted having trouble caring for all three children and told him it was his (Wayne's) turn to take care of Ethan. According to Headrick, he left Ethan with Wayne during a busy time in school and then allowed him to remain there partly because Ethan was a comfort to Haygood, who was suffering from AIDS.

In March 1985, the same month that Ethan began living in San Francisco, Headrick filed in Humboldt County Superior Court to have himself appointed Ethan's legal guardian. The petition named Greenwald and Wayne as the parents and himself as the "father of the minor's brother & sister." Headrick gave Wayne's address as "unknown" (although Wayne had lived at the same address for 10 years) and later filed a purported

---

[1] County welfare services received a referral in January 1984, and an investigation confirmed allegations that Iris and Ezra (then age six and eight) were arriving at school hungry and being left unsupervised at night on Headrick's land, which appeared to be a marijuana farm. The case was closed, however, when Jan McAdam gave birth and was at home to care for the children. A second referral in February 1985, concerned the children being moved often and left with friends for long periods of time, but that referral was not investigated.

consent by Wayne to the nomination.[2] The court issued letters of guardianship in July 1985 after receiving a report in which Headrick told a social worker he was not Ethan's biological father.

Ethan lived with Wayne for the next two years except for a visit with Headrick and the other children in 1985 and a month-long trip to Hawaii with them in late 1986. Ethan went to kindergarten and first grade in San Francisco and flourished in Wayne's care, also forming strong bonds with Wayne's parents, Sy and Sophie S. The grandparents (grandparents in Ethan's eyes) visited occasionally, and he and Wayne spent six weeks at their New Jersey home. Jack Haygood was a cocaretaker for Ethan until he succumbed to AIDS in November 1986.

A custody dispute leading to the instant appeals arose in early 1987 and peaked when Headrick forcibly tried to remove Ethan from his first-grade classroom on April 10. In a violent confrontation, Headrick grabbed and held Ethan in a standoff with the classroom teacher, Ethan's classmates and the school principal. San Francisco police ultimately convinced Headrick to leave.

That same day, on learning of the confrontation, Wayne filed a complaint in San Francisco Superior Court (No. 874023) under the UPA, seeking sole custody as Ethan's natural father, and a determination that Headrick was not the legal father. The mother Greenwald, was served in Australia and defaulted, but she submitted declarations in support of Wayne. Headrick answered, claiming to be Ethan's father under the presumption of Evidence Code section 621.[3]

On April 17 a week before answering the UPA action, Headrick applied ex parte in the guardianship case (Super. Ct. Humboldt County, 1985, No. 25892) for a restraining order that Ethan be returned to him based on fears that the grandparents might take the child to New Jersey. The order issued

---

[2] Wayne declared that he did not recall signing the form and that his purported signature appeared forged.

[3] Evidence Code section 621 reads in relevant part: "(a) Except as provided in subdivision (b), the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage.

"(b) Notwithstanding the provisions of subdivision (a), if the court finds that the conclusions of all the experts, as disclosed by the evidence based upon blood tests performed pursuant to Chapter 2 (commencing with Section 890) of Division 7 are that the husband is not the father of the child, the question of paternity of the husband shall be resolved accordingly.

"(c) The notice of motion for blood tests under subdivision (b) may be raised by the husband not later than two years from the child's date of birth.

"(d) The notice of motion for blood tests under subdivision (b) may be raised by the mother of the child not later than two years from the child's date of birth if the child's biological father has filed an affidavit with the court acknowledging paternity of the child."

but, when the court heard from the S.'s attorney, was vacated pending a contested hearing on Headrick's application for a preliminary hearing. The grandparents were at the time staying with Ethan in San Francisco to help out during a hospitalization of Wayne for an AIDS-related illness. Wayne had been diagnosed as having ARC (AIDS-related complex), a precursor to AIDS.

At a hearing on April 24 attended by all parties (including the grandparents), the court denied the preliminary injunction and referred the matter to the child-welfare-services division of the Humboldt County Department of Social Services for an investigation and report (Prob. Code, § 1513), meanwhile ordering a visit with Headrick and restraining Ethan's removal from San Francisco. Pending consideration of the report, a second visit was ordered.

The report, filed in two parts by social worker Jeanne Reilly, recommended that Ethan remain with the S.'s and that the injunction be denied. Reilly noted the two previous county welfare services referrals (see fn. 1, *ante*), the July 1985 guardianship, and that Headrick had not made use of the guardianship since then. She interviewed Headrick, Iris and Ezra, and others. Concern that Headrick could not provide a secure, stable home for Ethan prompted her recommendations. Nothing in the report indicated Headrick claimed or was understood to be Ethan's natural father.

A juvenile probation report received through the San Francisco Juvenile Court provided an evaluation of the S. home based on interviews with Wayne and his parents. The report found the parents to be energetic and "still young and healthy" (at ages 65 and 70). They were willing and able to provide a happy home for Ethan and, should Wayne not regain his health, to provide a permanent home in New Jersey. They were financially well off and had set up an education trust fund for Ethan five years earlier. The report found them able to provide a stable, nurturing environment for him.[4] Humboldt County Superior Court Judge J. Michael Brown evidently interviewed Ethan himself.

In July Judge Brown heard a motion by Headrick for temporary visitation. In opposition, the S.'s submitted another report from clinical psychologist Jonathan Canick, with whom Ethan had been in private therapy. Canick found that Ethan had formed strong bonds with Wayne and with the grandparents, whom he viewed as parent figures; Ethan did not regard Headrick as his father and resented what he saw as Headrick's attempts to

---

[4] By a will, nomination of guardian and medical authorization, Wayne provided for his parents to care for Ethan in the event of his death or incapacity. He also provided for care by a sister who lived in the apartment above his and had a regular relationship with Ethan.

intrude on the security of his life with the S.'s; after the schooltime "kidnapping" episode in April, Ethan developed an intense fear of being abducted off the street and began wetting himself. Having to fend for himself in his early years had made him feel obligated to take care of other children and adults (particularly Headrick). He had made great progress in therapy and school. Canick advised against visitation. Taking that and the other records into account, Judge Brown denied visitation pending a full hearing on a motion brought by Headrick in the interim to have the guardianship terminated and to place custody with himself as legal father.

Headrick also moved for visitation in the UPA action, and the matter was heard in August before San Francisco Superior Court Judge Ina L. Gyemant. Taking into account records on file in the Humboldt County action and additional declarations from Wayne and from Ethan's school principal (to whom Headrick had admitted not being Ethan's father), Judge Gyemant denied the motion, making written findings. She found that Ethan had lived with Wayne for nearly three years; that Wayne had been diagnosed as having AIDS; that another caretaker, Jack Haygood, had died of AIDS within the past year; that the child's grandparents were now living with Ethan and Wayne, providing adequate care for Ethan, and that Ethan was currently receiving psychotherapy to help him deal with major stresses in his life. She found it in Ethan's best interests to have no further disruptions in his life at that time and that visiting Headrick (or Iris and Ezra) would be disruptive and detrimental "in view of the already stressful situation."

Headrick, acting as his own attorney as he had all along, filed further motions for visitation, other motions and a flurry of separate actions in both courts. For the most part, however, they are not material to the issues on appeal and so are not recounted here.

Meanwhile, on August 18, a hearing was held in the Humboldt County action on a cross-petition by the S.'s to terminate the guardianship. The court (Hon. John Buffington) heard testimony from Dr. Canick, as a qualified expert. Canick supplemented his written report based on ongoing therapy with Ethan. Ethan showed continued improvement and stability, had strong positive bonds with both Wayne and the grandparents, appeared to understand that Wayne might die as Haygood had, wanted to be with the S.'s and shared strong mutual love and affection with them. Whereas Ethan had viewed Headrick as an intruder before, he was now terrified of him owing to the school incident and negative reactions to the two court-ordered visits since that time. Headrick had threatened Canick and seemed to be coercing the children. (Iris and Ezra had written apparently coached, sworn letters to the court on his behalf.) Ethan said he had been left alone

or in the care of Iris and Ezra, passed around to strangers, and forced to smoke marijuana. Canick's overall view had changed since the prior report in that he felt there should be no visits at all for now. Judge Buffington set a continued hearing date for October 2.

The later hearing took place, but the court did not rule. On October 15 Judge Buffington ordered the guardianship case transferred to San Francisco Superior Court (as action No. 247906) due to Ethan's long-term residence and the pendency of the UPA action (No. 874023) there.

Wayne brought his motion for summary judgment in the UPA action in November 1987. Judge Gyemant heard the matter on November 13 (dated Nov. 3 in the reporter's transcript), granted it by an order filed that day and entered judgment on December 18, 1987. The judgment decreed Wayne and Greenwald the father and mother, awarded Wayne and his parents joint legal and physical custody (with reasonable visitation to the mother) and ordered that Headrick have no rights to custody or visitation. Headrick filed a premature notice of appeal on November 20 which we may deem to have been filed immediately after the appealable judgment of December 18. (Cal. Rules of Court, rule 2(c).) In any event, he filed a second notice, this one from the December 18 judgment on February 16.

Certain remaining matters were consolidated in the San Francisco court, and in February 1988, the S.'s renewed their motion to terminate the guardianship. Judge Gyemant heard the termination matter on March 11 and on March 24 issued an order granting the petition, finding the guardianship no longer necessary. Headrick filed a notice of appeal on May 16.

It was revealed at the March hearing that Ethan and the parents had gone to New Jersey, with Wayne staying in San Francisco to receive AZT therapy. We are informally advised on appeal that Wayne died in November 1988 and that Ethan remains with the grandparents in New Jersey.

While Headrick appeals from orders in both the UPA and guardianship cases, all of his appeal arguments appear directed against the summary judgment in the UPA case, without mention of the order terminating guardianship. It would seem that he has abandoned his appeal from that order. In any event, since we reject all of his arguments, both orders may be affirmed without making that distinction.

DISCUSSION

I

■ Headrick contends that he was entitled to have court-appointed counsel in the UPA action and that being denied that right requires reversal. Our review of the record shows that he passingly asserted such a right once before Judge Gyemant[5] and another time complained that he could not find an attorney to represent him. Assuming for sake of argument that this was enough to preserve the issue for appeal (but see *Salas* v. *Cortez* (1979) 24 Cal.3d 22, 26 [154 Cal.Rptr. 529, 593 P.2d 226] [request made and denied], cert. den. (1980) 444 U.S. 900 [62 L.Ed.2d 136, 100 S.Ct. 209]; *In re Jay R.* (1983) 150 Cal.App.3d 251, 260 [197 Cal.Rptr. 672] [counsel must be requested]), we conclude that he had no right to have counsel appointed in any event.

Headrick does not rely on any statutory right to counsel and we are aware of none in a UPA action.[6] His claim rests on due process as guaranteed by the state Constitution's article I, section 7, subdivision (a) and the Fourteenth Amendment to the federal Constitution.

■ There is usually no due process right to counsel in civil cases. "Generally speaking, the right to counsel has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation. . . ." (*Walker* v. *State Bar* (1989) 49 Cal.3d 1107, 1116 [264 Cal.Rptr. 825, 783 P.2d 184], citing *Lassiter* v. *Department of Social Services* (1980) 452 U.S. 18, 25 [68 L.Ed.2d 640, 648, 101 S.Ct. 2153], and *Salas* v. *Cortez, supra*, 24 Cal.3d 22, 34 (*Salas*).) ■ For example, in holding an indigent parent in a state-brought paternity suit entitled to appointed counsel, our state

---

[5] Without formally moving for appointment of counsel or securing a ruling from the court, Headrick stated on the record:

". . . I think a lawyer ought to be appointed to act as a guardian ad litem with respect to the interest of [Ethan] as separate from my interest and separate from [Wayne's] interest, that Ethan needs someone protecting his interest, and I think a lawyer ought to be appointed for me.

"Every lawyer I've talked to gave me quotes between [$]2500 and $5,000 in order to take this case. Before any parent is deprived of his parental rights, which is what they're attempting to do to me in regard to this child, he should be given access to a lawyer and legal aid.

"I've been doing this case for months on my own. I put 40 hours to 50 hours a week into this, but I can't learn the entire law in order to fight it at the level at which they fight it. I don't have the money, and I don't have the help. . . ."

On Headrick's unopposed motion, this division appointed counsel for him on appeal, and he is now represented through the First District Appellate Project.

[6] Headrick cites Welfare and Institutions Code sections 317 and 318, evidently as general support that courts have authority to appoint counsel to indigents, but he acknowledges that those sections apply only to *dependency* proceedings.

Supreme Court in *Salas* relied partly on the fact that an adverse adjudication of paternity exposes a father to potential loss of property and liberty. It would be res judicata in civil proceedings to enforce support obligations and admissible (though not res judicata) in a criminal prosecution for nonsupport. (*Salas, supra,* 24 Cal.3d at pp. 28-29.) Here, in a reverse-paternity action, an adverse adjudication is that the defendant is *not* the father, a result which could not lead to the loss of property or liberty due to support obligations.

Nevertheless, the total severance of a parent-child relationship implicates a " 'liberty' " interest protected by due process (*In re Jay R., supra,* 150 Cal.App.3d 251, 259), and the right to counsel depends on a case-by-case examination (*id.,* at p. 261; cf. *Cleaver* v. *Wilcox* (9th Cir. 1974) 499 F.2d 940, 944-945). "Whether due process requires the appointment of counsel in a particular case depends on the interests involved and the nature of the proceedings. [Citations.] [Courts] must examine the nature and magnitude of the interests involved, the possible consequences [the defendants] face and the features which distinguish paternity proceedings from other civil proceedings. These factors must then be balanced against the state's interests." (*Salas, supra,* 24 Cal.3d 22, 27.)

Looking first at the interests involved, this case affects the severance of a parent-child relationship only in an abstract sense. Although Ethan lived with Headrick for the first four years or so of his life, it is undisputed that the child never considered Headrick his father during that time and, in fact, came to be terrified of him. He always believed Wayne to be his father, maintained a relationship with Wayne while living with Headrick and, by the time of this suit, had lived with Wayne for over two years—about one-third of his young life. Headrick's sole claim to the title "father" was (and continues on appeal to be) the presumption of Evidence Code section 621. Wayne, while not priorly adjudicated the natural father, was treated as such by everyone—even Headrick, at least until after the UPA action was filed. Thus, at the time of suit, Headrick did not claim to be the natural father and had no existing, de facto parent relationship with the child. His interest was thus "abstract" and not as "weighty" as that of an asserted natural parent's. (*Michelle W.* v. *Ronald W.* (1985) 39 Cal.3d 354, 362 [216 Cal.Rptr. 748, 703 P.2d 88].) He also had no current relationship with the child's mother, who had moved to Australia and herself had no current relationship with Ethan. There is no evidence or pleading to the contrary. The action thus did not threaten to "disrupt an established family and damage reputations" (*Salas, supra,* 24 Cal.3d 22, 28), and we have already noted that, this being an action to declare *non*paternity, Headrick was not exposed to "deprivation of property, and, potentially, [his own] liberty" (*id.,* at p. 28). This factor weighed against a right to counsel. (Contrast *In re*

*Jay R., supra,* 150 Cal.App.3d 251, 265 [right exists where a stepparent seeks to adopt without a natural parent's consent, alleging wilful failure to communicate or provide for the child].)

The possible consequences of an erroneous adjudication involve mostly the same considerations. The risk was losing an alleged right to *presumptive* paternal status and losing whatever visits or other contact he may have had (a somewhat disputed point) while Ethan had lived with Wayne. Even assuming that contact to be fairly consistent, as Headrick asserted, it had ceased to be a de facto parent relationship. This factor, too, militated against a right to counsel.

The next factor, the nature of the proceedings, also weighed against having counsel appointed. Unlike the situation in dependency, termination-of-parental-rights or paternity actions instituted at the behest of a district attorney, the defendant here was not "opposed by the full resources of the state, marshalled on the plaintiffs' behalf." (*Salas, supra,* 24 Cal.3d 22, 30.) This was a UPA action, brought entirely by a private party.[7] The state was not "intervening heavily on behalf of one side in what has traditionally been a private dispute . . . ." (*Id.,* at p. 31.) Nor, as a practical matter, does it appear that the action was terribly skewed by Wayne's ability to retain counsel. Headrick was not illiterate, incarcerated or otherwise seriously prevented from defending himself. He appeared for the proceedings, was articulate in his written and oral arguments and, it turns out, raised many of the same issues he raises now, through trained counsel, on appeal.

Against those factors, we must balance the state's interest in denying appointed counsel. The state is interested in overseeing the accuracy of paternity determinations so that support obligations are met, children do not become public charges and families are preserved. (*Salas, supra,* 24 Cal.3d 22, 31-33.) However, support obligations were not at issue here (*Wayne* was supporting Ethan already), Ethan would have a home whatever the case's outcome, and the only intact family was the plaintiff's, not Headrick's. "[T]he state has a significant interest in the fiscal implications of court-appointed counsel . . . ." (*Conservatorship of Sides* (1989) 211 Cal.App.3d 1086, 1093 [260 Cal.Rptr. 16].) Declaring a right to appointed counsel here would leave few paternity cases, if any, in which there was no such right for an indigent defendant. "The financial ramifications could well be extraordinary. [Citation.]" (*Ibid.*)

No right to court-appointed counsel existed.

---

[7] The record shows that Headrick was being pursued for AFDC welfare fraud, but that was a separate matter and the result of Ethan being out of his home. Headrick in fact told the county welfare department that Ethan was *not* his biological child.

## II

"A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) . . . ■ [T]he function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. . . ." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) Our function on review of a ruling is essentially the same. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

■ Headrick contends that the court erred in not applying the paternity presumption of Evidence Code section 621. (Civ. Code, § 7004, subd. (a), providing that the presumption applies in UPA actions.) At the very least, he argues, there were triable issues of fact whether he was married to and cohabitating with Maureen Greenwald, and not sterile or impotent, when Ethan was born to Greenwald. (Evid. Code, § 621, subd. (a); see fn. 3, *ante*.) He notes that the presumption is "conclusive" where applicable and is generally upheld, as against constitutional attack, where applied to defeat the rights of a natural father. (*Michael H.* v. *Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333], affg. *Michael H.* v. *Gerald D.* (1987) 191 Cal.App.3d 995 [236 Cal.Rptr. 810]; *Estate of Cornelious* (1984) 35 Cal.3d 461 [198 Cal.Rptr. 543, 674 P.2d 245]; but see applications held unconstitutional in *In re Melissa G.* (1989) 213 Cal.App.3d 1082, 1085-1089 [261 Cal.Rptr. 894], and *In re Lisa R.* (1975) 13 Cal.3d 636, 647-651 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017].)

Without grappling with constitutional issues, we may uphold the summary judgment on equitable estoppel grounds, as urged by Wayne on the motion below.

"Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (Evid. Code, § 623.)

■ "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Cita-

tions.]" (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].) The existence of an estoppel is generally a question of fact. However, it becomes a question of law when the evidence is not in conflict and is susceptible of only one reasonable inference. (*Id.*, at pp. 305-306.)

■■■ Headrick urges that the doctrine cannot apply here, as a matter of law or otherwise. Although he represented for years that Ethan was *not* his natural son and that Wayne was the father instead, he argues a lack of evidence that *Wayne* would have done anything differently had he known that he (Headrick) claimed in some way to be the father. He relies on two reverse-paternity cases using such an analysis. (*Michael H.* v. *Gerald D., supra,* 191 Cal.App.3d 995, 1011-1012 [putative father had no standing under the statute to challenge the presumption on his own and so suffered no detriment from failure of presumed father and wife/mother to challenge the presumption within the prescribed time]; *In re Lisa R., supra,* 13 Cal.3d 636, 645 [putative father did not suffer detriment by the mother and county designating him the natural father in an unsuccessful termination action].)

However, we need not focus purely on detriment caused to *Wayne.* Precedent allows us to analyze estoppel from *Ethan's* viewpoint. ■■■ As we observed in *In re Marriage of Valle* (1975) 53 Cal.App.3d 837, 841 [126 Cal.Rptr. 38]: "[T]he elements of estoppel have equal application to establish the relationship between a child and his putative father. . . . [I]n this type of case the estoppel runs in favor of the child, not the spouse . . . ." (Citing *Clevenger* v. *Clevenger* (1961) 189 Cal.App.2d 658, 673 [11 Cal.Rptr. 707, 90 A.L.R.2d 569].) "Thus, in order to establish an estoppel vis-à-vis the putative father, there must be a showing that (1) the putative father represented to the child that he was his father; (2) the child relied upon the representation by accepting and treating the putative father as his father; (3) the child was ignorant of the true facts; and (4) the representation was of such duration that it frustrated the realistic opportunity to discover the natural father and to reestablish the child-parent relationship between the child and the natural father [citation]." (*In re Marriage of Valle, supra,* 53 Cal.App.3d at p. 841; accord *In re Marriage of Johnson* (1979) 88 Cal.App.3d 848, 852 [152 Cal.Rptr. 121].)

■■■ The cases just cited each invoked estoppel against a man who had told the child he *was* the father, thus obligating the man to support the child. However, we see no reason why estoppel should not apply in the more unusual case, as here, where the man tells the child he is *not* the father and that another man is. In this case, there is no policy risk that applying the doctrine will leave the child fatherless or unsupported. Also, if we view

the cases cited above as justified by the policy of preserving existing father-child relationships, the same policy is served by an estoppel here.

The evidence shows without dispute that at all times preceding this UPA action, Headrick told others and acted as though Wayne were the natural father; the undisputed facts that Ethan grew up believing Wayne was his father and that Iris and Ezra were his "half"-siblings implies (with no room for contrary inferences) that Headrick told him as much. (*In re Marriage of Johnson, supra*, 88 Cal.App.3d 848, 852.) Ethan relied on that representation, building a life-long relationship with Wayne as his natural father and living with Wayne on that understanding, developing parent-like attachments with the "grandparents" who stepped in when the ailing Wayne tragically died. As far as the evidence shows, Ethan never knew that Headrick made parental claims over him. Finally, acting on his understanding, Ethan treated Wayne as his natural father for his whole life, came to live and strongly identify with him and his family, and never formed parental bonds with Headrick. As tailored to this unusual fact situation, all elements of estoppel are shown as a matter of law on the record. (*Driscoll* v. *City of Los Angeles, supra*, 67 Cal.2d 297, 305-306.)

This resolution of the appeal makes it unnecessary to decide whether the judgment is alternatively supportable by the doctrines of collateral estoppel or res judicata since Headrick acknowledged *non*paternity in the prior dissolution and guardianship actions. (Compare *In re Marriage of Guardino* (1979) 95 Cal.App.3d 77, 94 [156 Cal.Rptr. 883], *Brown* v. *Superior Court* (1979) 98 Cal.App.3d 633, 636 [159 Cal.Rptr. 604], and *Adamson* v. *Adamson* (1962) 209 Cal.App.2d 492, 499-501 [26 Cal.Rptr. 236], with *In re Lisa R., supra*, 13 Cal.3d 636, 645-647.)

### III

Headrick urges that summary judgment (Code Civ. Proc., § 437c) is not available in UPA actions because they may entail the termination of a parent-child relationship. However, the case on which he relies only found the procedure inapplicable to actual parental-rights-termination actions (Civ. Code, § 232), noting in part that special speedy-trial provisions control such actions. (*In re Mark K.* (1984) 159 Cal.App.3d 94, 100-104 [205 Cal.Rptr. 393].) The case does not purport to state a broader rule. Such a rule would conflict with precedent applying summary judgment in paternity actions. (See, e.g., *Michael H.* v. *Gerald D., supra*, 191 Cal.App.3d 995, 1000.)

## DISPOSITION

The judgments are affirmed.

Kline, J., and Benson, J., concurred.

Respondents' petition for review by the Supreme Court was denied September 20, 1990.