[No. A126914. First Dist., Div. Three. Aug. 9, 2011.]

Guardianship of H.C., a Minor.
Z.B. et al., Petitioners and Respondents, v.
L.B., Objector and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III., IV. and V.

**COUNSEL**

Mary R. Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard P. Sax for Plaintiffs and Respondents.

Janet G. Sherwood, under appointment by the Court of Appeal, for Minor.

**OPINION**

**SIGGINS, J.**—The probate court appointed 16-year-old H.C.'s brother and sister-in-law as her guardians over the objection of her mother, L.B. L.B. contends the court committed constitutional error when it declined her requests for appointed counsel. She also asserts the guardianship is not supported by substantial evidence and that the court failed to obtain a statutorily required report and comply with the notice requirements of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). In the published portion of this opinion, we conclude L.B. was not entitled to appointed counsel and that the results of a child protective services investigation were adequately reported to the trial court. In the unpublished portion we conclude that only the ICWA claim has merit. We therefore order a limited reversal for compliance with the ICWA, and otherwise affirm the judgment.

## BACKGROUND

### H.C. Comes to Live with Z.B. and Heather B.

H.C. was born in May 1995. Her brother Z.B., 16 years her senior, had always been a father figure to her. Z.B. became concerned about his sister in

the spring of 2008, when she was in seventh grade. Her academic performance had plummeted and she had been caught smoking marijuana, stealing condoms and skipping school. Z.B. and his wife, Heather B., tried to arrange for H.C. to spend a semester with them in Santa Rosa, but L.B. would not permit it.

In May 2009 Z.B. drove to Clearlake to check on H.C. When he arrived, she and her friends were smoking marijuana and cigarettes. L.B. was asleep on a couch a couple of feet away. Z.B. told H.C. that she was coming to live with him. H.C. packed her things and left voluntarily with Z.B.

Z.B. decided that one way to help H.C. was to have her talk with her various family members about her poor behavior. One of those relatives was L.B.'s brother Steven M., who owned the house where H.C. and L.B. lived. When it was time for her to speak with her uncle Steven, H.C. started screaming and crying as they drove to Steven's house. Finally, she told Z.B. that Steven had molested her. Z.B. took H.C. back to her mother's home and called his wife to figure out what to do next. That evening Z.B. learned that L.B. left H.C. at Steven's house. He picked her up and together they reported the molestation to the sheriff.[1]

Once the matter was reported to the sheriff, Lake County Child Protective Services (CPS) became involved. H.C. told the assigned child protective worker that L.B. knew she smoked marijuana, and L.B. admitted she used methamphetamine within two weeks of her interview by CPS. Although L.B. knew about the molestations she had not notified the police, sought medical care, or taken any steps to protect her daughter. The caseworker concluded it was necessary to place H.C. either with a guardian or in foster care.

CPS could not place H.C. with Z.B. if she were formally detained in a dependency because he had a criminal record. However, he was the only person who demonstrated any care for H.C., and the caseworker felt that placement with Z.B. and Heather would be better for her than foster care. When she was presented with the alternatives of foster care or placement with Z.B., L.B. signed a nonbinding "safety plan" consenting to let H.C. live temporarily with her brother and sister-in-law.

Z.B. and Heather quickly filed petitions for appointment as H.C.'s temporary and permanent guardians. They alleged that H.C. had been sexually assaulted by Steven, that Steven came by her house every day, and that due to the assaults she had been getting into trouble and missing school. They

---

[1] Steven was eventually arrested on charges relating to the alleged abuse and made several admissions. Those charges were pending during the guardianship proceedings.

further alleged that L.B. knew about the assaults but failed to notify law enforcement, had an ongoing drug problem, and relied on Steven for a home, work, and money. H.C. filed a written consent to the proposed guardianship.

The court denied the petition for temporary appointment on June 12, 2009, after Z.B. and Heather failed to appear at two scheduled hearings.

### The Court Investigator's Report

The court investigator filed a report on July 23, 2009. Z.B. told the investigator that both of his parents abused methamphetamines when he was a child. He related a childhood and early adulthood spent moving from place to place with his mother and various relatives and friends, punctuated by about a year and a half in juvenile detention facilities when he was in high school. In his early 20's Z.B. moved to San Diego and fathered his first child. He owed back child support but was making support payments. Eventually he moved back to Northern California, where he lived with a woman for several years and fathered a daughter.

Z.B. started using methamphetamine when he was 23 or 24 years old and used heavily between 2005 and 2006, but he completed a nine-month drug program and told the investigator he was drug free except for one "slip up" within a year of the interview. Z.B. spent a year in jail for possession of methamphetamines when he was in San Diego and since then was arrested for fighting about three times. Heather had one arrest from June 2009 that she explained to the court investigator occurred when she picked up mail from a former address where she and Z.B. were still receiving mail and was arrested for possession of stolen property. The case was pending during the guardianship proceedings.

Z.B. and Heather met in 2005, married in 2007, and had a child in 2009. Z.B. said that Heather brought structure to his life and enabled him to care for H.C. The couple lived in a two-story, three-bedroom home in a residential neighborhood, where H.C. shared a bedroom with Z.B.'s eight-year-old daughter from his previous relationship. The home was very clean and well kept. Z.B. did some plumbing jobs and had received a workers' compensation settlement for a job-related injury. Heather worked part time for a construction company and was starting a vending machine business with Z.B. She also had some business dealings on eBay.

The confidential portion of the investigator's report provided the detail of Z.B.'s criminal history. He had a number of arrests between 1994 and 2008: a 1998 conviction for battery, a 2004 conviction for transporting controlled substances that was set aside after he completed a drug treatment

program, a 2007 conviction for fighting in public, and a 2008 probation violation and misdemeanor convictions for possession of a controlled substance and grand theft.

L.B. had been arrested three times between 1994 and 2004. Each incident involved possession of a controlled substance. In 2004 she was arrested in Kansas for possession of simulated controlled substances, child endangerment, possession of opiates and driving with a suspended license, but was convicted only for driving on a suspended license.

During the guardianship proceeding, H.C. was living with Z.B. and Heather in Rohnert Park. She did not want to live with L.B. She told the court investigator that she told L.B. about Steven's sexual abuse of her just before Christmas 2008, but that L.B. continued to leave her alone with Steven and told her not to tell Z.B. Steven dropped by their house every day.

H.C. believed her mother had drug problems. L.B. slept "all the time," and was hard to awaken. L.B. told H.C. that it was all right for her to smoke marijuana and would call H.C.'s school to provide excuses for H.C. when she skipped class, as she often did.

Asked to explain the differences between living with L.B. and living with Z.B. and Heather, H.C. said that in her brother's home she had to go to school; there was food in the refrigerator; someone was always home when she got back from school every day; she had new clothes to wear; they had a "sit-down" dinner every evening; she lived in a clean house; and she had chores to do. She said that all of these "are the opposite" of living with L.B. H.C. did not like some of Z.B. and Heather's rules, but she was beginning to realize they were imposed for her own benefit.

L.B.'s house was cluttered, unkempt and dirty when the court investigator visited. L.B. said she was packing to move, but had not yet decided where she would go or found other housing. The conditions in the home were not suitable for a teenage girl.

L.B. said she had been arrested a "few" times in her life, and was evasive about her drug use. She initially denied ever abusing drugs or alcohol. Then she said she had used methamphetamine "once in a while, a long time ago," then, that she does use methamphetamine "once in a great while." Finally, she said that "[i]f it [(methamphetamine)] falls in my lap, I might, but I wouldn't waste money on it."

CPS had records of two neglect-related referrals of L.B. concerning Z.B. in the late 1980's. As to the current referral, L.B. said that CPS coerced her into

permitting H.C. to stay with Z.B. She also said that Z.B. and Heather had gotten H.C. to lie about the alleged molestation. L.B. said that when H.C. first told her what Steven was doing she offered to go to the police, but H.C. "freaked out" and said, "No, no, it was not that bad." In L.B.'s view, Steven was not a sexual predator. She thought he was trying to teach H.C. something, and "crossed the line." She denied bailing him out of jail, and said she merely assured the bail bondsman he could believe Steven if he said he was good for the bail money.

The court investigator recommended that the court deny Z.B.'s petition for guardianship due to his criminal history, probationary status, drug use, failure to support his oldest child, and Heather's pending criminal case. However, the investigator believed a guardianship was necessary because of L.B.'s dangerous lifestyle and failure to protect H.C. The investigator asked the child protective worker whether CPS would intervene if Z.B. and Heather were not appointed guardians. The caseworker said CPS would not intervene unless it received another referral.

### The Hearings

On July 31, 2009, the court set an August 25, 2009 trial date on the permanent guardianship petition. L.B. wanted the court to make an order allowing her visitation with her daughter. The court declined because the only matter before it was the guardianship petition, and told the parties "[w]hat happens between now and then is up to the whole family."

In mid-August, Z.B. and Heather filed a new temporary guardianship petition. They alleged that L.B. was still living in Steven's house and would appear without notice at Z.B. and Heather's house at all hours, demanding to see H.C., upsetting H.C. and everyone else in the household. The court granted the temporary guardianship over L.B.'s opposition and rejected another request by her for interim visitation.

On the date set for the guardianship trial, L.B.'s son, J.B., appeared and announced that he intended to file a competing guardianship petition. The court told the parties it was appointing counsel for H.C., so the hearing was delayed while the temporary guardianship remained in place. L.B. asked to have an attorney appointed, which the court denied. She also repeated her request for visits pending trial. The court declined to order visitation "off the bench" but said that any party could file an application for visitation during the temporary guardianship.

The trial took place on September 15 and September 17, 2009. J.B. had not petitioned for guardianship. L.B. said she had his paperwork, but the court

rejected it as untimely. The court explained the order of proof and the procedures for questioning witnesses and offering documents. The court investigator's report was admitted into evidence.

L.B. requested a continuance "because I need an attorney. And obviously my rights as a mother are being intervened with. And I need to have an attorney here because I'm going to have to apply for some sort of financial aid." The court denied L.B.'s request and explained that, although she could hire an attorney, she was not entitled to appointed counsel.

The court heard extensive testimony from Z.B., H.C., and Heather in support of the guardianship petition. All three were cross-examined by both H.C.'s attorney and L.B. L.B. called J.B., who testified that it was his opinion Z.B. was seeking guardianship only for financial gain, that Heather and Z.B.'s allegations were false, and that L.B. was a great parent. L.B. testified at considerable length, in narrative form.

After two days of testimony and arguments, the court stated from the bench its decision to grant the petition. It concluded that "a guardianship was necessary and appropriate." It found by clear and convincing evidence that it would be detrimental for H.C. to stay with L.B., and that a guardianship with Z.B. and Heather was in H.C.'s best interest. The court explained that L.B. had been "on the wrong track" in parenting H.C. in light of the marijuana smoking, stealing, truancy, inadequate supervision at home, the unkempt house and drug paraphernalia in the home. The court believed L.B.'s inability to care for her daughter was caused in part by an unaddressed substance abuse problem, that she had not taken reasonable steps to protect H.C. from Steven, and that her dependence on Steven for shelter created an unhealthy conflict.

The court also expressed reservations as to whether Z.B. and Heather were appropriate guardians, but it concluded that trying out the proposed guardianship was a preferable alternative to CPS intervention and H.C.'s placement in foster care with strangers. The court ordered the court investigator to provide a review report in 90 days. Z.B. was ordered to provide the investigator with drug test results.

L.B. filed a timely appeal.[2]

---

[2] We note that counsel was appointed to represent L.B. on appeal.

## DISCUSSION

### I. L.B. Did Not Have a Due Process Right to Appointed Counsel

L.B. contends she had a constitutional right to appointed counsel in the probate court proceedings because she was faced with the loss of custody and, potentially, with the eventual loss of her parental rights.

### A. *Probate Code Guardianships*

Under the Probate Code, a court may appoint a guardian for a minor "if it appears necessary or convenient." (Prob. Code, § 1514, subd. (a).) If the court grants custody to a nonparent, it may do so over a parent's objection only if it finds that custody with the parent is detrimental to the child and that custody with the nonparent is necessary in the child's best interest. (Fam. Code, § 3041, subd. (a).)[3] While the child's health, safety, and welfare, and any history of abuse or substance abuse by a parent are relevant (Fam. Code, § 3011), "the critical finding of detriment to the child does not necessarily turn on parental unfitness. It may be based on the prospect that a successful, established custodial arrangement would be disrupted." (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1123 [90 Cal.Rptr.3d 701, 202 P.3d 1089]; see Fam. Code, § 3041, subd. (c).) If it is not in the child's best interest to remain in a parent's custody, the preference is for custody with "the person or persons in whose home the child has been living in a wholesome and stable environment." (Fam. Code, § 3040, subd. (a)(2).) The parent's rights over the child are suspended for the duration of the probate guardianship. (Fam. Code, § 7505, subd. (a); *Guardianship of Ann S., supra*, at p. 1124.) However, the court retains discretion to grant visitation, and may terminate the guardianship on a petition by the guardian, a parent, or the child, based on the child's best interest. (*Guardianship of Ann S.*, at pp. 1123–1124; § 1601.)

### B. *The Due Process Right to Counsel*

We have found no California authority that directly addresses whether and under what circumstances a parent may have a due process right to counsel in a guardianship proceeding brought under the Probate Code, but the principles that guide the due process considerations have been extensively explored in the related context of dependency proceedings. "The governing federal authority is *Lassiter* v. *Department of Social Services* (1981) 452 U.S.

---

[3] Probate Code section 1514, subdivision (b), specifies that the appointment of a guardian is governed by Family Code, division 8, part 2, chapters 1 and 2 (§§ 3020 et seq., 3040 et seq.) Unless otherwise noted, further statutory citations are to the Probate Code.

18 [68 L.Ed.2d 640, 101 S.Ct. 2153]. The court there was faced with an appeal from termination of parental rights because the state court had not appointed counsel to represent the parent in the termination proceedings. The Supreme Court acknowledged that while the parent-child relationship is an important one warranting protection [citation], the singular potential of loss of custodial/parental rights is not sufficient to rebut the presumption that, absent the potential of deprivation of physical liberty, as in criminal prosecutions, there is ordinarily no constitutional right to appointment of counsel [citation]. Rather, the question is whether the complexity of the issues to be resolved and the capacity of the parent to obtain a fair hearing without counsel impel the appointment." (*In re Angelica V.* (1995) 39 Cal.App.4th 1007, 1013 [46 Cal.Rptr.2d 295] (*Angelica V.*); see also *In re Sade C.* (1996) 13 Cal.4th 952, 982 [55 Cal.Rptr.2d 771, 920 P.2d 716].) It is now beyond debate that *Lassiter* controls whether a parent must be provided counsel in proceedings implicating the parent's custody or parental rights. (See *In re Sade C., supra*, at pp. 986–993; *Iraheta v. Superior Court* (1999) 70 Cal.App.4th 1500, 1505–1508 [83 Cal.Rptr.2d 471]; *In re Ronald R.* (1995) 37 Cal.App.4th 1186, 1195–1197 [44 Cal.Rptr.2d 22]; *In re Arturo A.* (1992) 8 Cal.App.4th 229, 238 [10 Cal.Rptr.2d 131]; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1707–1708 [12 Cal.Rptr.2d 294]; *Guardianship of Ethan S.* (1990) 221 Cal.App.3d 1403, 1412–1414 [271 Cal.Rptr. 121].)

■ To apply *Lassiter*, we first balance the three factors identified in *Mathews v. Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 96 S.Ct. 893] as central to any due process analyses. They are: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." (*Lassiter v. Department of Social Services, supra*, 452 U.S. at p. 27 (*Lassiter*).) We then set the "net weight" of those factors against the presumption that there is a right to appointed counsel only where the proceedings threaten the indigent litigant's personal liberty. (*Ibid.*) "If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the *Eldridge* factors will not always be so distributed, and since 'due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed,' [citation], neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding." (*Id.* at p. 31.) To the contrary, whether a parent possesses a constitutional due process right to appointment of counsel in dependency actions demands resolution on a case-by-case basis. (*Id.* at pp. 26, 31–32; *Angelica V., supra*, 39 Cal.App.4th at p. 1013; *In re Christina P.* (1985) 175 Cal.App.3d 115, 129 [220 Cal.Rptr. 525]; *In re Ronald R., supra*, 37 Cal.App.4th at p. 1195.)

## *1. The Private Interests*

■ The private interests at stake here are significant. L.B. faces the loss of her daughter's care, companionship and custody for an indefinite period of time that could conceivably last until H.C.'s majority. "It is well settled that a parent's interest in maintaining a normal parent/child relationship is an extremely important interest." (*In re Emilye A., supra,* 9 Cal.App.4th at p. 1708; see *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1642 [54 Cal.Rptr.2d 722].) Even though L.B.'s interest in the proceedings is significant, she is not threatened with the termination of her parental rights. "A termination of parental rights is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development. It is hardly surprising that this forced dissolution of the parent-child relationship has been recognized as a punitive sanction by courts, Congress, and commentators. The Court candidly notes, as it must . . . that termination of parental rights by the State is a 'unique kind of deprivation.' " (*Lassiter, supra,* 452 U.S. at pp. 39–40 (dis. opn. of Blackmun, J.), fns. & citation omitted; see *In re Kristin H., supra,* at p. 1661.)

Thus, when hearings in dependency cases may result in findings that later serve as the basis for terminating parental rights, our courts have generally found a due process right to appointed counsel. (*In re Arturo A., supra,* 8 Cal.App.4th at pp. 239–240; *In re Jackson W.* (2010) 184 Cal.App.4th 247, 261 [108 Cal.Rptr.3d 509]; *In re Andrew S.* (1994) 27 Cal.App.4th 541, 548–549 [32 Cal.Rptr.2d 670]; but see *In re Kristin H., supra,* 46 Cal.App.4th at p. 1666; *Angelica V., supra,* 39 Cal.App.4th at p. 1013, fn. 3.)[4]

■ We disagree with L.B.'s assertion that the recent addition of section 1516.5 to the probate guardianship statutes demonstrates that the instant proceedings fall within the category of proceedings that lead to the termination of parental rights. Pursuant to section 1516.5, a guardian may petition to have a child declared free from a parent's custody and control if the parent lacks legal custody, the child has been in the guardian's physical custody for

---

[4] L.B. mischaracterizes *In re Arturo A.* as holding that due process requires mandatory appointment of counsel at every stage of the dependency proceedings. It does not. The due process right to counsel attaches when a proceeding may result in orders that would serve as a basis for terminating parental rights, i.e. terminating or denying services and setting a selection and implementation hearing. (*In re Arturo A., supra,* 8 Cal.App.4th at pp. 239–240; see *In re Ronald R., supra,* 37 Cal.App.4th at p. 1195.) Although the same court later clarified in *Angelica V.,* that the most critical factors are the complexity of the issues and the likelihood that appointed counsel would affect the outcome, it did so in the context of addressing proceedings in which the result may be the termination of parental rights. (*Angelica V., supra,* 39 Cal.App.4th at p. 1013, fn. 3.)

at least two years, and the court finds, considering all factors relevant to the child's best interest, that the child would benefit from adoption by the guardian. (§ 1516.5, subd. (a).)[5] But unlike the dependency scheme, none of the findings that can lead to termination are made in the initial guardianship proceeding. Moreover, here there is no indication that Heather and Z.B. will pursue termination under section 1516.5. Their petition expresses no intention to adopt H.C., and they testified their wish is for L.B. to maintain her relationship with H.C. if she can control her methamphetamine problem. Moreover, L.B. retains the right to seek visitation during the guardianship and to petition for dissolution of the guardianship, as do both H.C. and her guardians. (§ 1601.) The possibility that Heather and Z.B. could later seek adoption under section 1516.5 does not pose an equivalent threat to L.B.'s parental rights as adverse dependency rulings that may lead directly to termination.

It is also significant that the guardianship proceedings carried no threat of criminal charges against L.B., a factor that, when present, heightens the private interest at stake. (*Lassiter, supra,* 452 U.S. at p. 27, fn. 3; accord, *Salas v. Cortez* (1979) 24 Cal.3d 22, 28–29 [154 Cal.Rptr. 529, 593 P.2d 226] (*Salas*) [due process right to counsel for defendants in paternity proceedings by state]; *In re Emilye A., supra,* 9 Cal.App.4th at pp. 1708–1709; cf. *Guardianship of Ethan S., supra,* 221 Cal.App.3d at p. 1413 [no potential loss of liberty or property in reverse-paternity action].) While L.B.'s personal interests in the guardianship proceedings are profound, they do not occupy the same plane as those of a parent in proceedings that trigger termination of parental rights.

### 2. The State's Interests and the Risk of an Erroneous Decision

■ The differences between a private guardianship proceeding and a state-prosecuted dependency figure strongly in assessing both the government's interest in the proceeding and the risk of an erroneous decision. Compared even to a section 1516.5 petition to free a ward for adoption by the guardian, "[d]ependency proceedings are fundamentally different. . . . The state is not a party to a probate guardianship, and its resources are not pitted against the parent. [Citation.] Nor does the state assume jurisdiction over the child and proceed toward family reunification or an alternative permanent placement, as in dependency cases. Rather, probate guardianship is a private custody arrangement approved but not supervised by the court. The state initiates no proceedings and carries no burden to prove anything. It performs

---

[5] The parent is statutorily entitled to counsel in a proceeding under section 1516.5 (§ 1516.5, subd. (c)) and the requirements for termination of the parental relationship must be found by clear and convincing evidence. (*Guardianship of Ann S., supra,* 45 Cal.4th at p. 1127, fn. 9.)

only a judicial role." (*Guardianship of Ann S., supra,* 45 Cal.4th at p. 1133; see also *Guardianship of Ethan S., supra,* 221 Cal.App.3d at p. 1414 [private action brought under Uniform Parentage Act (Fam. Code, § 7600 et seq.)]; cf. *Salas, supra,* 24 Cal.3d at p. 30 [defendants in paternity action prosecuted by county were "opposed by the full resources of the state, marshalled on the plaintiffs' behalf"]; *In re Emilye A., supra,* 9 Cal.App.4th at p. 1709; see also *Lassiter, supra,* 452 U.S. at p. 43, fn. 9 (dis. opn. by Blackmun, J.) [observing that due process may not require appointed counsel when a guardian or other private party, rather than the state, seeks termination of parental rights].)

The private guardianship proceedings here did not present the David and Goliath scenario created when the power of the state is brought to bear upon an unrepresented parent. Here, as in *Guardianship of Ann S.,* the state's only role was judicial; it had no particular interest in the outcome, and it played no part in proving the guardianship petition. While it is in the state's general fiscal interest to avoid the expense and potential delay inherent in appointing counsel, it also has an interest in the child's welfare that may best be served by making sure that both sides are adequately represented. (*Lassiter, supra,* 452 U.S. at pp. 27–28; *Guardianship of Ethan S., supra,* 221 Cal.App.3d at p. 1414; *In re Emilye, supra,* 9 Cal.App.4th at p. 1709.) Thus, while the state's interests add little to the *Eldridge* equation in this situation, its relatively limited role makes the private guardianship proceeding a less pressing case for appointed counsel than a state-prosecuted dependency.

Moreover, as difficult as it may be for an unrepresented parent to navigate the rules of evidence and courtroom procedure, this case did not involve expert medical or psychiatric testimony or other particularly complex areas "which few parents are equipped to understand and fewer still to confute." (*Lassiter, supra,* 452 U.S. at p. 30; *In re Emilye A., supra,* 9 Cal.App.4th at p. 1709.) The court gave L.B. considerable leeway in questioning witnesses, giving her narrative testimony, and arguing her defense, and carefully considered evidence that weighed both in favor of and against the guardianship petition. Finally, in this case there was compelling evidence—including H.C.'s clearly expressed wishes—in favor of the petition. All of these points weigh against the risk of error and the likelihood that the result would have been different had L.B. been represented by counsel.

In sum, this is not a case where "the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak . . . ." (*Lassiter, supra,* 452 U.S. at p. 31.) L.B.'s interest in appointed counsel to oppose the guardianship petition does not outweigh the presumption that due process guarantees appointed counsel only where loss of liberty is threatened. (*Ibid.*)

## II.   Compliance with Section 1513

L.B. contends the court exceeded its jurisdiction and committed prejudicial error when it adjudicated the guardianship petition without a written report from Child Protective Services pursuant to section 1513, subdivision (c). The contention is meritless.

██  "Unless waived by the court, a court investigator . . . may make an investigation and file with the court a report and recommendation" concerning a proposed guardianship. (§ 1513, subd. (a).) Under section 1513, subdivision (c), if the investigator finds that any party alleges the proposed ward's parent is unfit, as defined by Welfare and Institutions Code section 300, "the case shall be referred to the county agency designated to investigate potential dependencies" and "[g]uardianship proceedings shall not be completed until the investigation required by Sections 328 and 329 of the Welfare and Institutions Code is completed and a report is provided to the court in which the guardianship is pending." Welfare and Institutions Code sections 328 and 329 require a child protective worker to investigate whether the family should be offered services and whether juvenile court proceedings should be commenced if there is a report of abuse or neglect or cause to believe a child has been abused or neglected.

L.B. maintains the court violated section 1513, subdivision (c), because the child protective worker did not provide the court with a written report of her investigation. But the statute did not require her to do so. The caseworker conducted the required investigation under Welfare and Institutions Code section 328 after Z.B. and H.C. went to the police. She concluded that a guardianship or foster placement was necessary, that placement with Z.B. and Heather was preferable to foster care, and that Z.B.'s criminal history would foreclose the court's ability to place H.C. in his home if dependency proceedings were to be initiated in juvenile court. All of this was reported to the court investigator and included in his written report to the probate court. Accordingly, the record demonstrates compliance with the statutory requirement. The record also presents circumstances that readily distinguish this case from *Guardianship of Christian G.* (2011) 195 Cal.App.4th 581 [124 Cal.Rptr.3d 642], where there was a complete failure to comply with section 1513.

Assuming, arguendo, that the Legislature intended (without specifying) that the child protective worker must file a separate written report with the court, no prejudice could have resulted from its absence in light of the information in the report by the court investigator. We perceive nothing in the statutory language to support L.B.'s claim that the report requirement is jurisdictional, and there is no indication in the record that the court was deprived of important information.

## III.–V.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The guardianship order is conditionally reversed for failure to comply with ICWA's notice provisions. The case is remanded to the probate court with directions to provide proper ICWA notice of the guardianship proceedings. If, after receiving appropriate notice, no tribe indicates that H.C. is an Indian child within the meaning of the ICWA, the probate court shall reinstate the guardianship. In all other respects the guardianship order is affirmed.

Pollak, Acting P. J., and Jenkins, J., concurred.

On September 1, 2011, the opinon was modified to read as printed above.

---

[*]See footnote, *ante*, page 1235.