Filed 8/6/21  Guardianship of K.J. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Guardianship of K.J., JR., et al., Minors. | |
| JENNIFER J., Petitioner and Appellant, v. KAYE O. P., Objector and Respondent. | F080728 (Super. Ct. No. 3481) **OPINION** |

APPEAL from an order of the Superior Court of Mariposa County. F. Dana Walton, Judge.

Jennifer J., in pro. per., for Petitioner and Appellant.

Moran Law Firm, Amanda K. Moran and Janay D. Kinder, for Objector and Respondent.

-ooOoo-

The probate court awarded paternal grandmother, Kaye P. (grandmother), guardianship of her two grandsons, now 10-year-old K.J., Jr., and six-year-old K.J. (collectively, the boys). The boys' mother, Jennifer J. (mother), who represented herself

both below and on appeal,[1] appeals the probate court's order, which also denied her petition to terminate the guardianship.

Mother contends the order should be reversed because: (1) Probate Code section 2250, which dispenses with notice for a hearing on a petition for temporary guardianship on a showing of good cause, violates due process; (2) probate guardianships should be treated as criminal or quasi-criminal proceedings, with all the attendant rights, including the right to secure an attorney and to confront witnesses; (3) the probate court erred by admitting and relying on hearsay evidence of her alleged drug relapse; (4) the probate court erred by not disqualifying grandmother's expert witness; (5) assuming she relapsed, the probate court erred by awarding custody to grandmother on that basis alone; and (6) the probate court erred by failing to consider recent domestic violence the boys' father, K.J. (father), inflicted on mother. Finding no merit to mother's contentions, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 30, 2019,[2] grandmother, acting in propria persona, filed a petition to be appointed the guardian of the boys, who were then eight and five years old. The petition asserted grandmother had been the boys' guardian from May 2016 to March 2019, and mother regained custody of the boys on March 11 based on three negative hair follicle tests and her sworn statements, which she made in "guardianship court" on December 17, 2018, and in her April 3, 2018 declaration, that she was not using illegal drugs.

---

[1]     Soon after mother filed her notice of appeal in propria persona, she filed a form substituting an attorney in her place. Before the opening brief was due, mother's attorney died. By two court orders, we granted mother time to file a substitution of attorney and stayed briefing on the merits of the appeal, but informed her if she failed to file a substitution of attorney within the time permitted, we would consider her to be self-represented. Mother did not file a substitution of attorney within the allotted time, so she is proceeding as a self-represented litigant on appeal.

[2]     References to dates are to the year 2019, unless otherwise stated, in this section.

The petition stated guardianship was necessary because: (1) mother hired another person, Marcie Villalpando (Marcie), through Craigslist to take the hair follicle tests in her place because she was not clean; (2) mother did not have a stable place to live and may be unemployed; (3) mother had not been consistently caring for the boys and their school attendance was inconsistent; (4) mother had not allowed father or grandmother to visit the boys after the guardianship was terminated; and (5) father was unable to care for the boys as he was on probation in a domestic violence case. Grandmother did not believe the boys were in a safe, stable, drug-free living environment and asserted mother had not provided for their care consistently since she gained custody in March.

The petition stated it would be in the boys' best interest for grandmother to be appointed guardian because she had been the boys' guardian for nearly three years and had taken care of them for extended periods since they were young; she had a stable home and job as a special education teacher; when in her care, the boys attended school regularly and had regular medical and dental care; and she would not keep the boys away from their parents as long as they were safe.

Grandmother also requested appointment as the boys' temporary guardian. In that petition, grandmother asserted the boys needed a temporary guardian because: (1) mother was believed to be on methamphetamine, as she hired someone else to take her place for hair follicle tests; (2) she did not have a stable place to live; (3) she had not been caring for the boys consistently and could not be located for several days at a time; (4) the boys' school attendance was inconsistent; and (5) father was on probation for domestic violence and was homeless.

Grandmother asked to be excused from giving mother and father notice of the hearing on the petition for appointment of a temporary guardian. As good cause for the request, the petition asserted father was aware grandmother was filing for guardianship and was not contesting it, and he would be notified of all guardianship hearings. With respect to mother, grandmother was concerned she would hide the boys or remove them

3.

from Mariposa County if notified prior to emergency temporary guardianship. The petition stated mother had a boyfriend who lived in Bakersfield and she would go there to stay for days at a time, grandmother did not know where mother was staying with the children although she sometimes dropped them off or picked them up from school, and once the boys were safe, grandmother would make every attempt to serve her any papers required for the temporary or permanent guardianship.

Attached to the petition for temporary guardianship were two declarations, one from Marcie and the other from Matthew Hamlett, who had employed mother. Marcie stated in her declaration that she contacted a Craigslist ad that read "Easy GIG 90-Day Hair Folicle [*sic*]" via e-mail. Mother responded and told her she needed the hair follicle test because she was in the process of a guardianship hearing for her children, her ex-husband was abusive, and child protective services had taken the children, who were in the care of his mother. Mother told Marcie she was not clean and would not pass the hair follicle test, but she was cleaning up and needed Marcie to test for her once. Marcie stated she completed three hair follicle tests for mother in Merced in January and March, and while mother agreed to pay her for each test, she did not fully pay her. After that, mother disconnected her number, removed Marcie from Facebook and Marcie had no contact with mother since mother's last text to her on March 21. Marcie further stated, "[p]lease see all the attached forms and documents," and apologized for her deception, claiming mother had lied and manipulated her. The signed declaration, dated May 1, stated, "I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct."

Attached to the declaration was one e-mail string from December 29, 2018, in which Marcie stated she was interested in the "gig" and could pass the hair follicle test, and mother purportedly responded that she had been trying to terminate the boys' guardianship for over a year, her husband recently came back into her life and was in jail for trying to kill her, grandmother had guardianship, and she wanted her kids back. The

4.

e-mail further stated mother passed a hair follicle test in March 2018, but the judge wanted another one and "to be honest I won't pass," and she was trying to find someone she could pay to pose as her and get the test done, stating the clerk that did the collection barely paid attention to the identification.

On May 30, the probate court appointed grandmother the boys' temporary guardian without notice to mother or father and set a hearing on the guardianship petition for July 1.

Mother filed a petition to terminate the temporary guardianship on June 21, which was set for hearing on July 1. She asserted it was in the boys' best interest to terminate the guardianship because the hearing on the temporary guardianship was held without her knowledge on the ground that she would hide the boys, but she had never given any indication she would do such a thing. Mother stated she worked very hard to terminate the first guardianship, father brutally attacked her six months ago and was convicted of domestic violence, and she believed the guardianship placed the boys at great risk of harm because grandmother was relying on father to care for the boys in violation of Family Code[3] section 3044. Mother did not believe grandmother could care for the boys in a safe environment, as she relied on father to take them to school and allowed them to sleep with father in his van, where he was living. Father had violated a restraining order that protected mother and her daughters, Sydney H. and Maddison M., by going to the school the girls attended. Mother claimed the boys did not have their own beds to sleep in, they were dropped off at school not fully dressed for the weather, and they were sustaining long term trauma from being moved back and forth between households.

Mother attached her declaration to the petition, in which she claimed she quit methamphetamine and had not used drugs since. Mother attached maps with her locations from her cellphone which she said proved she was at the Merced courthouse

---

[3]      Undesignated statutory references are to the Family Code.

when the tests were taken, and said she had witnesses for three of the tests: Lisa Parker went with her to two tests, and her 14-year-old daughter, Sydney, was with her when she took two tests. Mother had no idea who Marcie was.

Mother further stated she had several places to live. The boys had their own rooms and beds at the house in Bakersfield. Mother also had a "small but mighty support system in Mariposa," consisting mostly of family, who would step in whenever she needed them. Mother would love to stay in Mariposa, but she had a job in Bakersfield and a beautiful home, where she was not at risk of seeing father. Mother admitted K.J., Jr., had missed some school, but a lot of his poor attendance was when grandmother had guardianship, and the recent missed days occurred when the boys told her they wanted to stay home with her, which seemed reasonable as it allowed them to reconnect and bond with her. Mother asserted her oldest daughter, Sarah, was the only other main caregiver for the boys.

Attached to the petition were declarations from mother's three daughters and her first mother-in-law, printouts of her google location history on the date of the hair follicle tests, a copy of the restraining order and criminal protective order, and the sheriff's report from father's domestic violence case. The restraining order, which was filed on January 10, states mother and two of her daughters are protected from father. The Mariposa County Sheriff's Office report states the domestic violence case was based on a December 4, 2018 incident, in which mother reported father placed her in a chokehold three times during a domestic dispute at her home. Father was arrested at grandmother's home and charged with corporal injury to a spouse and false imprisonment. None of the children were present during the incident.

### The July Hearings

Grandmother and mother both appeared in pro per at the July 1 hearing. The minute order states the probate court noted it would be a lengthy trial and continued the hearing to July 17.

At the July 17 hearing, grandmother appeared with an attorney, Casey Aitchison. Aitchison stated at the last hearing the probate court ordered a witness to return on July 17, but she was not there, and Aitchison needed her to be able to present grandmother's case. The probate court agreed to issue a bench warrant for the witness, noting it specifically ordered her to be there. Mother told the probate court she was notified four days ago that grandmother retained counsel and asked if she could have some time to retain her own attorney. Mother thought it was possible an attorney from Oakhurst would represent her, but she did not know when he was available. Aitchison contacted the attorney's secretary for mother, who gave her some dates when he was available. Aitchison, however, was not able to reach the witness and suggested the probate court issue and stay the bench warrant. The probate court agreed to do so. The probate court denied Aitchison's request to allow the boys to have unsupervised visits with father at grandmother's discretion, noting the existence of the restraining order. The probate court continued the hearing to September 11.

***The September 11 Hearing***

At the September 11 hearing, Aitchison informed the probate court she was unable to personally serve Marcie, but not for lack of trying. Aitchison explained she hired a process server to personally serve Marcie with the order after hearing. While the process server looked at two addresses Aitchison obtained from a background check, they did not find her at either address. Aitchison sent the order to Marcie at the e-mail address Marcie used to contact grandmother and father which stated she was required to be at the hearing; the e-mail was not returned. She also sent Marcie three e-mails explaining she was required to be there. Finally, grandmother texted Marcie telling her what was happening and that she needed to be there. According to grandmother, Marcie texted back: "Don't threaten me. I have gone there once. I'm not going anymore."

Aitchison, however, believed there could be a work-around if she were able to obtain the signature pages from the hair follicle tests, as the witness told grandmother she

7.

was unable to forge mother's signature. Aitchison sent mother a request for production of the signature pages, but mother never responded. Mother stated she decided against getting counsel because it was "costing me so much money driving back and forth." She did not provide the documents because she was not going to use them at trial.

The probate court stated it intended to issue a civil warrant for Marcie. Aitchison asked the probate court to allow father unsupervised time with the boys so he could take them to school in the morning, adding that the restraining order prevented father from going to the school. Aitchison said father brought documents showing his participation in the court-ordered programs from the criminal case, his completion of phase two of the drug court, and his probation officer's statement that he was doing well. Mother stated father was not prevented from going to the school anymore because the girls were no longer going there. Father informed the probate court there was both a civil family law restraining order, which protects mother and the two girls, and a criminal one that protects only mother. The probate court declined to make any changes on visitation until it was able to review all the restraining orders. After mother told the probate court she did not have any objection to visitation with father, the probate court told Aitchison to prepare an order.

Aitchison intended to bring a motion to compel mother to produce the signature pages, but also would try to subpoena them from the Merced County Superior Court. The probate court denied mother's request for overnight visits with the boys and continued the hearing to October 9.

Aitchison prepared an order after hearing, which the probate court signed and filed on October 8. The order states: (1) Marcie was present at the July 1 hearing and ordered by the probate court to appear at the July 17 hearing, but she failed to appear; (2) the probate court issued and stayed a bench warrant for Marcie's arrest to ensure her attendance at the September 11 hearing, but Marcie failed to appear; and (3) the probate court now issues and releases the civil warrant to be lodged with the sheriff and entered

8.

into the statewide system. The order further states that, by agreement of the parties, consideration of the evidence presented, and good cause appearing, the probate court does not place any restrictions on father's visitation and contact with the boys, adding that the order is not intended to preempt any family law court orders pertaining to any other children that are not subject to the guardianship or any criminal protective order.

*The October 9 Hearing*

At the October 9 hearing, Aitchison informed the probate court she subpoenaed the signature pages for the hair follicle tests from the Merced County Superior Court, which she received and wanted to lodge with the court.

The subpoenaed documents were contained in a packet marked as exhibit A, which Aitchison asked the probate court to review before making "an order on what should happen next." The packet consisted of: (1) a letter from the Merced County Superior Court; (2) the March 20, 2018 drug screen, which had a signature and mother's phone number with a 209 area code; (3) the January 7 drug screen; (4) the March 5 drug screen; (5) a proof of service; (6) the page mother signed in her response to the guardianship petition and request to terminate the guardianship; (7) Marcie's declaration that was attached to grandmother's petition; and (8) the e-mail chain that was filed with the probate court.

Aitchison asserted the January 7 signature appeared to be an attempt to match the previous signature and the phone number was the same except it had a 559 area code. Aitchison believed the March 5 signature clearly looked different and noted the phone number had a 009 area code. Aitchison asserted mother's signature on her response looked "very similar" to the signature on the first drug test, and Marcie's signature on her declaration and the signature on the third drug test looked similar. Aitchison noted the e-mail chain showed the e-mail purportedly from mother with the same phone number with a 209 area code, while Marcie had a 559 area code. Aitchison asserted that all of this showed the person who signed the second and third drug tests had a different

9.

signature than mother's and was consistent with the drug test being done by two different people.

Mother objected to Aitchison judging her handwriting because she was not a handwriting specialist. Mother asserted her signature had changed over the years and she had a 559 area code because she bought a "throwaway phone." Mother later added that it was easy to falsify e-mails and the e-mail did not come from her e-mail address. The probate court stated it would set the matter for hearing so mother could explain these things while under oath.

Aitchison told the probate court she had not had any more contact from the witness. She was waiting to receive last hearing's order from the probate court, but she would e-mail it to the witness once she received it and ask the witness to contact her. Aitchison asked the probate court if it would receive the court investigator's report without the need for the court investigator to be present. The probate court responded, yes. The probate court set the trial for November 26.

***The Trial on the Grandmother's and Mother's Petitions***

Trial on the grandmother's petition for guardianship and mother's petition to terminate the guardianship took place on November 26 and December 4. The probate court confirmed it would consider the court investigator's report without her presence at trial; Aitchison noted the investigator had concerns about mother's ability to provide stability for the boys.[4]

Grandmother and father testified in grandmother's case-in-chief. Father testified someone who said her name was Marcie Villalpondo contacted him in March through Facebook Messenger to tell him that she took the hair follicle test for mother, and they

---

[4] The Probate Code requires a court investigator to investigate and report on any proposed guardianship, unless the court waives the investigation. (Prob. Code, § 1513, subd. (a).) The probate court is required to read and consider the court investigator's report prior to ruling on the petition for guardianship. (*Id.*, § 1513, subd. (c).)

exchanged a series of messages. Father sent the messages to grandmother, since she had been the boys' guardian. The Facebook messages included screenshots of purported messages from mother's phone, which had mother's name and phone number on them. One of the screenshots was a picture of mother's driver's license, which father recognized as hers.

Father provided Aitchison with a complete, true and correct copy of all the Facebook messages he received. The Facebook messages were marked as exhibit 1, which father confirmed was a transcript of the Facebook messages he provided Aitchison and a true and correct copy of the messages.[5] When Aitchison asked that the document be received into evidence, the probate court asked if there was an objection and hearing none, admitted the exhibit. Father confirmed he told Marcie to reach out to grandmother and gave her grandmother's number, and Marcie provided him with a screenshot of mother's telephone number and a picture of her driver's license.

Father testified he was on probation and was actively participating in all his classes. He completed a parenting class and was attending drug court and batterers' treatment. Father provided Aitchison with a statement from the batterers' treatment program attesting to his progress, which was admitted into evidence as exhibit 2. Father testified there were no restraining orders in place that specifically named the boys, although there were restraining orders that restrained him from having contact with mother and her other children. Father was asking the probate court to continue the guardianship for the time being. Father admitted the family court ordered him to have supervised visits with the boys. The probate court took judicial notice of the family court file and order on its own motion.

---

[5] According to the minute order of the hearing, exhibit 1 is a 12-page stapled document. None of the exhibits entered into evidence at trial or lodged with the probate court are in the appellate record, as mother, through her attorney, did not designate them for inclusion.

11.

During a break in the proceedings, mother filed a declaration with a document attached that purported to be a text exchange between the probate court judge and another person. Mother stated her son created the document at her request to show the likelihood screenshots of text messages could be altered or fabricated. Aitchison did not dispute people can manufacture documents. The probate court told mother even if text messages can be falsified, "the declaration of the person who, at one time, was in this courtroom and was ordered to come back to testify, the declaration pretty much solidifies what those e-mails are, indicating that she had contact with you, and that she claims to have taken those tests," although that had not yet been proven. Mother stated she did not understand what the probate court was saying; the probate court responded it was "saying she was here at one time ready to testify, and we didn't go forward, and I ordered her to be here. But she filed a declaration with the Court … [¶] … [¶] stating what occurred from her." The probate court said it would allow mother's son to testify as to how he created the document and mother could also testify about that if she wished.

Grandmother then testified. She said Marcie contacted her in March via Facebook Messenger and they exchanged multiple text messages. She also had spoken with Marcie on the phone and was present the day she came to court. When Marcie first contacted her on Facebook, she told grandmother that father advised her to contact grandmother about taking the hair follicle test for mother. Grandmother provided Aitchison with a complete record of their Facebook communications, which was marked as exhibit 4. Grandmother confirmed exhibit 4 was a true and correct copy of all the communications she had with Marcie via Facebook.[6]

In those communications, grandmother asked Marcie to provide the communications Marcie had with mother. One was a picture of mother and four of her

---

[6] According to the minute order, exhibit 4 consists of a 72-page colored document of Facebook messages.

12.

children, including the boys, in front of the Mariposa County Superior Court, and there were more pictures of the children. The rest of the communications asked Marcie if she was willing to come forward as a witness. Marcie explained what the Merced courthouse looked like, where she went to do the hair follicle tests, the address mother provided her, and a picture of mother's California driver's license. When Aitchison moved to have exhibit 4 received into evidence, the probate court asked mother if she had "any objection at this stage?" Mother responded, "[o]bjection to that being submit[ted] as evidence?" The probate court answered, "Yes," and mother responded, "No." The probate court admitted the exhibit.

In those communications, grandmother asked Marcie to e-mail her a declaration with attachments showing her contacts with mother, which she did. Grandmother forwarded the e-mail to Aitchison, which was marked as exhibit 5.[7] After grandmother confirmed exhibit 5 was a true and correct copy of the entire e-mail Marcie sent her on May 13, Aitchison asked to move the exhibit into evidence. Mother objected "based on what I showed you earlier about them being able to be falsified." The probate court overruled the objection, stating mother could present evidence on that on cross-examination or in her own case, and admitted the exhibit.

Grandmother confirmed an attachment to the declaration in exhibit 5 states the Craigslist ad was placed around December 2018. A response at the top of the document signed by "J." states: "Marc[ie], sorry for taking so long to get back to you. I passed a hair follicle test back in March, but now the judge is saying he wants another one. And to be honest, I won't pass." Grandmother denied typing that herself or having someone type it for her. Grandmother also denied creating, or having some else: (1) create a false Craigslist ad saying she was mother and asking someone to take a hair follicle test; (2) create a false Craigslist identity of mother; (3) create fake texts from mother; (4) snap

---

**7** According to the minute order, exhibit 5 consists of a 13-page stapled document.

a picture of mother's driver's license and text it to someone; (5) create a fake Facebook profile for mother or Marcie; and (6) pay someone to come to the earlier court hearing and say they were Marcie.

Grandmother is Facebook friends with Marcie and confirmed exhibit 6 is a snapshot of Marcie's Facebook page.[8] Grandmother asked Marcie to come to that day's hearing and told her there was a warrant out for her arrest, but Marcie did not appear. Grandmother confirmed she had Aitchison hire a process server to try and serve her with a subpoena, paid Aitchison to perform a background search to try and find her so they could serve her, and asked Aitchison to have the probate court issue a warrant to secure her attendance. Despite all these things, they had not been able to secure Marcie's attendance at the hearing.

Based on grandmother's testimony, Aitchison asked the probate court "to make a finding that the witness is unavailable." The probate court asked mother: "Would you agree?" Mother asked the probate court to say that again. The probate court explained, "She's asking me to make a finding that Ms. Villalpondo is an unavailable witness." Mother responded, "Seems that would be the case, yes." The probate court stated, "The finding is so made."

Grandmother testified the picture of Marcie on the Facebook profile in exhibit 6 showed the person who appeared in court. Grandmother again denied creating that Facebook account and making up a fake name and fake person, or that anyone else did. Grandmother also denied either she or someone else posted a Craigslist ad in December 2018, and made fake Facebook accounts and messages, fake text messages, and fake e-mails.

On cross-examination, grandmother testified her primary concern for the boys after they were returned to mother was Marcie telling her she took the drug test for

---

[8]    It does not appear that exhibit 6 was ever moved into evidence.

14.

mother and mother telling Marcie she was still using drugs and would have a negative drug test. Grandmother did not ever believe Marcie was lying. Grandmother agreed there was information grandmother gave Marcie that Marcie would not have otherwise had, but she did not believe Marcie could have used that information to lie about mother. Grandmother also was concerned that mother did not want to live in a stable place for a long period of time, and the boys were not always with her but were being watched by someone else.

Aitchison did not have any other witnesses, but she wanted to make sure the deposition subpoena production from Merced County Superior Court, which she previously provided to the probate court as exhibit A, was lodged in the court's file. The probate court confirmed it had the exhibit.

Mother's witnesses were Lisa Parker, her son, Dylan H., her daughter, Sydney, Patricia Morris, and herself. Lisa Parker testified she drove mother to Merced County Superior Court to take a hair follicle test in March 2018 and loaned her money for the test. Parker explained the process for the test and stated mother later texted her that the test result was negative.

Eighteen-year-old Dylan testified he altered the text messages attached to mother's declaration, marked as exhibit A, using a downloadable program on his computer to show how easy it is to alter text messages. Dylan had no training on editing text messages; it took him about 10 minutes to alter the messages, which included looking at a YouTube tutorial.

Dylan grew up with the boys, who were his half brothers; he did not see any reason why they should not be in mother's care. He had never known mother to be on methamphetamine. He had no knowledge of mother possibly paying someone else to take a hair follicle test for her and did not think that was something she would likely do.

The probate court showed Dylan the texts in exhibit 5 and asked him if they were different than the ones he created. Dylan responded there were multiple ways to change

content, such as changing the name, number and dates, which could be done easily. Dylan did not know if the texts in exhibit 5 were created with the same program he used, but it would be easy to screenshot something with similar content. Dylan was knowledgeable about this because his father did information technology work and he followed YouTube channels on video editing. Dylan could not tell if there was anything on the exhibit 5 text message that would indicate it was not real because it was a very low-resolution image. To Dylan's knowledge, mother had never had a phone with a 559 area code.

Fourteen-year-old Sydney testified she knew the boys, who were her half brothers, well, and she had never seen mother do anything to show they should not be with her. Sydney had never seen mother on methamphetamine while she or the boys were in her care. Sydney had seen problems with the boys being placed with grandmother, but she had not been to grandmother's house within the past year. The last time she was there, the boys did not have very many clothes, and they either slept in the same bed or on the couch. Sydney went to the same school as the boys and saw them come to school in the winter without jackets; Sydney called mother and she brought them jackets. Sydney felt mother had a stable living environment and when she lived with mother, she never felt she did not have a place to sleep, food to eat, or the basics of life. Mother always had a bed and food for the boys when they were with her.

Sydney was aware mother took several hair follicle tests for the probate court in the guardianship case; Sydney was with mother for two of them, one in 2018 and the other in January 2019, and mother told her about the other two. Sydney went to the 2018 test with mother and Lisa Parker. For the January 2019 test, Sydney was the only one with mother. Sydney saw the lady named Marcie in court at an earlier hearing and she had never seen her before. Sydney described the process mother went through to provide the hair sample and she did not see Marcie there that day.

Sydney said grandmother stopped paying for mother's cellphone bill around November 2018. After that, mother had a prepaid cellular phone for a few months until John Marsha, who Dylan described as mother's surrogate father, started paying for her cellphone. Sydney had complete access to mother's cellphone and had never seen a text message concerning someone else taking a hair follicle test for mother. Sydney also had complete access to mother's e-mails, which she sometimes checked for mother, and had never seen an e-mail from someone about taking a hair follicle test for her.

On cross-examination, Sydney testified she went to high school in Mariposa and lived with her father, her grandparents, and her two brothers, while mother lived in Bakersfield. On redirect, Sydney testified she knew mother's address in Bakersfield, and she and the boys had their own rooms there. She had never had any negative experiences in that house.

Patricia Morris had known mother since February 2017. She spent time with the boys and saw mother interact with them. She never saw any evidence that it would be detrimental to the boys to be placed with mother rather than grandmother, or any evidence that would make her think mother was on methamphetamine. Morris believed mother's home life had been stable since March—mother lived with Morris for a while and then mother moved to the Bakersfield area. Morris had seen the boys cry when they had to leave mother and return to grandmother.

On cross-examination, Morris testified she would be surprised to learn mother had a positive drug test in December 2017 that was extremely high for methamphetamine. On redirect, Morris testified that from the first time she met mother, she had been a good mother to all her children. Morris's granddaughter spent a lot of time with mother and Morris felt mother cared for her well.

Mother testified she is not a habitual, frequent, or continual user of illegal substances. She had never been charged with a drug-related offense and the samples she gave at the Merced court were hair follicle samples, not urine samples. She asserted the

17.

emergency orders for the boys were not based on any evidence of child abuse or molestation. Mother stated Marcie's written testimony was "completely false" and she never met the woman. She had only seen Marcie that one day in court, and never corresponded with her. The text messages and supposed e-mails from Craigslist were not from her. She was not on drugs and while it was not easy to quit, she did.

The probate court asked mother what her plans were. Mother said she was going to live in Bakersfield. She was engaged and had a good job in property management. When the boys are with her, they would attend a nearby elementary school, and Sydney might move to Bakersfield for the next school year. She would like to move back to Mariposa eventually, but there was not a lot of opportunity for her there and her fiancé is a part owner of a very large tax firm. The boys knew her fiancé; he and mother had been together since January, and the boys spent quite a bit of time with him before they went back with grandmother in May. Mother admitted her hair follicle test in December 2017 was over seven times the cut-off for methamphetamine, although she did not think it was a large amount. In any event, she knew she should not have it in her system.

Aitchison called a rebuttal witness on grandmother's behalf—her husband, Steven Aitchison—to rebut Dylan's testimony it would be simple to manufacture a screenshot and present the fake evidence as a hoax. Steven first testified about his credentials. He had been a graphic designer for 30 years and owned a graphic design business for 22 years. Steven confirmed he is Aitchison's husband and they had been married eight years. In the past 30 years, he had designed thousands of web pages. His graphic design business is mostly for pharmaceutical companies—he designs web pages and sets up medical conferences sponsored by pharmaceutical companies at places all over the world. Steven also owns other businesses, including vacation rentals. He is very familiar with Craigslist, as he uses it in his vacation rental business to post and answer Craigslist ads. He promotes his business through Facebook and regularly uses it to send and receive messages. He also has experience with e-mails—he gets over 700 e-mails a day and

oversees the daily marketing e-mail blasts that go out from his graphic design business. He agreed it was fair to say he was familiar with Craigslist, Facebook, graphic design, and web pages.

At that point, Aitchison submitted Steven was an expert in those areas and asked him to be qualified as an expert. The probate court gave mother the opportunity to question Steven on his status. Mother asked how much experience he had with cellphones and text messaging. Steven said it was his primary method of communication for all his businesses—he probably sent 50 to 70 texts per day and made phone calls. Mother then began asking him questions relevant to whether the communications were forged. She asked if it was possible to change the date and timestamp on text messages. Steven responded not within the phone, but it was possible if the texts were outside the phone. Steven was aware Facebook account duplication occurred, when someone creates a false Facebook profile that looks like a real person's and hacks their account and messages. He had 30 years' experience with photo editing software—it was a major part of his business—and he agreed it was difficult to edit a photo of text messages, as it would take "immense effort" to do it without being able to detect it was done. He also agreed it was difficult to recreate or fake Craigslist generated e-mails due to the way Craigslist works in generating e-mail addresses to protect both parties' anonymity and privacy. Even if someone just changed the names on an actual string of text messages, you would still have to match fonts or colors exactly without evidence of overlay or that something changed.

The probate court stated it was going to deem Steven an expert witness, but mother could argue why he should not be considered an expert once his testimony concluded. Mother then asked Steven about his experience with cellphone text messages and altering them, especially timestamps. Steven responded it would be the same as doing it with Facebook or Craigslist, and it was possible to edit messages off a phone, but it was quite limited. Businesses he works with have asked him to verify screenshots for

19.

their validity, such as determining whether someone had beat a registration deadline. Steven had seen people alter e-mails and texts to try to skirt deadlines, and it usually was quite evident when it happened. Mother asked if he ever tried to alter a timestamp. Steven said he had quite a bit of experience taking out timestamps and recreating "stuff" to illustrate the process used to fabricate an e-mail where someone was trying to beat a deadline and did not put the right timestamp.

Aitchison asked Steven about the court's exhibit A, which Dylan prepared. At first glance it looked to Steven like a series of text messages on a phone, but he could tell it was done manually on a computer, probably by taking a screenshot of an actual conversation, clearing out the text, and creating new conversation pieces. It was clear to him "in seconds that this was mocked up by a person rather than done on a computer."

Steven reviewed exhibits 1, 4, and 5. He reviewed several pages of the Facebook conversation in exhibit 1 and opined it did not appear to be forged, altered, or manufactured, as they appeared consistent with Facebook and contained things Facebook automatically generates. Based on his experience, exhibit 1 appeared to contain genuine Facebook printouts. There was nothing in the screenshots purportedly from Marcie's phone to indicate they were altered. The documents contained a level of detail and quality that would take more than two weeks to duplicate. He could not imagine a layperson creating them due to the level of consistency.

In Steven's opinion, the Facebook printouts of grandmother's conversation with Marcie contained in exhibit 4 were not mocked and forged, as the level of consistency was "just masterful." He did not believe the average person could forge them and only a professional could have created them. He did not see anything to suggest it was a forgery. Steven also opined it would be "insanely complicated" to forge the e-mail from Marcie to grandmother, which was exhibit 5, due to the level of consistency. The Craigslist references on the e-mails also indicate it is not a forgery, as they were consistent with how Craigslist does things.

20.

On cross-examination, mother asked about the different font sizes on the e-mails; Steven believed the different font sizes indicated it was less likely the e-mails had been altered. Mother then asked why different font sizes on text messages indicated a forgery. Steven explained cellphones are different from e-mails, because a cellphone generates the font size, not the user, so the font size is the same, which is why he could tell court's exhibit A could not have been generated by a cellphone—the font sizes were different. On e-mails, however, people regularly use different font sizes. Steven admitted it was possible mother's purported Facebook account was copied, but even if it was, it would have been an "immense effort" to create a conversation with such depth and detail.

After a break in Steven's testimony, mother produced "new evidence" she printed out with Sydney to show that a date and timestamp on a phone could be changed. She was able to take a screenshot and change the date and time. The probate court marked the document for identification. Mother continued to question Steven. He did not agree the times and dates on the text messages in exhibit 5 could have been changed without using photo editing software, as the phone service enters the times through their system. Steven testified the time and date appeared to have been changed on the text messages Dylan created because they did not correlate to the messages. Steven, however, admitted he did not have any experience with changing the dates and times on phones.

Mother asked Steven to explain again why he would expect different font sizes on an e-mail but not a cellphone. Steven responded that on e-mails the computer or cellphone on either end of the communication governs, each of which has the capacity to dictate the fonts being used and can do things that are not allowed in cellphone texts. Therefore, when the font is off in texts, that generally signals something has been switched. Steven began to talk about e-mail conversations using a text-only program when mother objected based on his lack of personal knowledge of cellphones. The probate court overruled the objection and stated it would give the testimony the weight it deserved.

After Steven concluded his testimony, mother asked to recall Sydney, who she intended to qualify as an expert. As an offer of proof, mother said Sydney would testify she knew the date and time could be changed and how to do it, and it only took her two minutes to do so. She also knew how to easily edit photos and could edit Snapchat and make it look believable. Mother believed Sydney had more expert knowledge about phones than Steven. Aitchison stated she would accept the offer of proof and the probate court agreed to accept it.

Aitchison also made an offer of proof that grandmother would testify she has separate beds for the boys, and they have jackets. In addition, one of the boys had perfect school attendance and while the other one had missed school, she had doctor's excuses for him, and the boys were doing very well. Mother accepted the offer of proof.

In closing argument, Aitchison argued it would have taken a mastermind to create a fake Craigslist, Facebook, and screenshots in the week between the time the guardianship was terminated until the first date stamp appeared, and it would take a lot of money to hire someone to do it. Aitchison asserted the most logical explanation was not that someone was trying to blackmail mother by contriving a hoax, but rather that mother hired someone to take the January and March tests for her. Aitchison further argued the signatures and wrong phone numbers on the hair follicle tests were consistent with someone taking the tests for mother. Aitchison noted all the evidence was submitted without objection, and rightly so because Evidence Code section 1230 allows the admission of statements that are a declaration against interest when a witness is unavailable. Aitchison did not think mother's actions had been in her children's best interest, such as mother moving to Bakersfield when her children lived in Mariposa, and having her children testify rather than making an offer of proof.

Mother began her argument by addressing section 3041.5, which sets out when drug tests are allowed in guardianship proceedings and the kind of test allowed. The probate court stopped her to clarify it told her "at the very beginning you didn't have to

22.

take [the drug tests], that they would be voluntary, and you chose to do so." Mother asserted the voluntary nature of the tests proved she took them herself, which the probate court acknowledged was evidence of that possibility. Mother argued the voluntary drug tests were not admissible because they did not meet the standards of section 3041.5, i.e., they were not through a federal employee testing agency, they were not urine tests, and the results were not kept confidential, as the results were revealed during the trial.

When mother stated she did not know how to explain why she moved to Bakersfield, the probate court noted she could have testified about that, but the only issue was whether she defrauded the probate court by having someone else take her test. Mother responded if that was the real issue, the boys should not have been taken from her, and especially not on an ex parte basis, as the law clearly states a positive drug test alone is not enough to place children in a guardianship. Mother argued that even if she regained the boys by fraudulent testing, that did not show detriment to them. The probate court asked if her argument was that a chronic meth user should not have their children removed. Mother responded there was no evidence she was a chronic meth user. The probate court stated there was evidence she obtained the boys fraudulently, and it dissolved the guardianship and handed the boys over to her based on those tests.

Mother asserted that she obtained a number with a 559 area code after grandmother shut her phone off, but as soon as she got back on a regular plan, her area code changed to 209. She further asserted her signature changed all the time. The probate court asked what evidence there was that the phone and e-mail messages, and Craigslist ad, were not true. Mother did not believe there was enough evidence to show it was true, adding that while a person came to court and said their name, there was no proof that was who they really were. In addition, mother said she proved the text messages and timestamps on the phone could be altered, she disproved Steven's credibility regarding cellphones, and she had seen hoax Facebooks all the time. She said there was no way of knowing whether the Facebook account was hers, as there was no

proof there were not two Facebooks, one that was hers and the other fake. Mother did not think it likely she would have gone to this extreme to prove she took a drug test she did not have to take. The probate court again emphasized it told her she did not have to take the drug test and it would not order her to take one, and the fact was she chose to take the tests. Mother agreed.

The probate court stated its decision to terminate the guardianship was based on the facts mother was clean, working, and nearby, things seemed to be going well, and grandmother would be around. Mother did not see how they were using the declaration from a person who disappeared. The probate court explained evidence was presented that the person was unavailable, and she did not object; instead, mother agreed the person was not available. The probate court added it granted temporary guardianship to grandmother because it was concerned mother defrauded the court and "caused a result other than what the result would have been." Mother did not see how defrauding the court could be considered detriment. The probate court answered it would be a detriment to the boys if their mother was using methamphetamine and she was saying that was not the case.

After a break, the probate court announced its decision from the bench. The probate court stated it was faced with a determination whether an unknown person created "this situation" by claiming mother defrauded the court by having someone else take drug tests she agreed to take, or whether mother really had someone else take the drug tests, which led to the court dismissing the original guardianship. The court found there were overwhelming clear and convincing evidence someone did not attempt to frame mother by creating massive numbers of e-mails to mislead the court. Moreover, there was evidence from the prior guardianship mother had some dirty tests and a clean test, and while mother's testimony was that she was not a drug abuser, methamphetamine is highly addictive, and the addiction remains.

The probate court could not accept mother's explanations that the court was defrauded by the texts between mother and Marcie. Instead, there was clear and

convincing evidence mother did not take the tests and had she taken them, she would have been dirty because "a fail test is a dirty test." Based on the e-mails, mother knew she would test dirty and her only hope of terminating the prior guardianship was to have clean tests, so she took it upon herself to have Marcie take the tests. The probate court recognized section 3041.5 indicated a positive test alone was insufficient, but that was one positive test, not multiple positive tests, and the fact mother defrauded the court shows mother is not prepared to have custody of the boys. Accordingly, the probate court denied mother's petition and granted grandmother's petition for guardianship.

The probate court stated it was not going to tell mother she would never regain her children, because she had the ability to create the appropriate circumstances and restore the court's confidence in her and her decision making. Therefore, the probate court believed it was in the boys' best interest to remain guardians of grandmother, who would have discretion over mother's visits. Aitchison asked the probate court to continue its order allowing father to have unrestricted contact with the boys at grandmother's discretion. The court stated it would make that order, but if anything ended up "in a family court situation," it would defer to the family court on that issue if necessary.

The probate court later signed a written order denying mother's petition to terminate the guardianship and granting grandmother's petition for guardianship, prepared by Aitchison, consistent with its oral ruling.[9]

## DISCUSSION

### I. General Legal Principles and the Standard of Review

The Probate Code provides that "[a] relative or other person on behalf of the minor … may file a petition for the appointment of a guardian of the minor." (Prob. Code,

---

[9] Mother appeals from this order. We understand the order granting grandmother's petition for guardianship to be an order granting letters of guardianship, and the order denying mother's petition to terminate the guardianship to be a refusal to grant an order revoking letters of guardianship, under Probate Code section 1301, subdivision (a).

25.

§ 1510, subd. (a).)  "The probate court may appoint a guardian 'if it appears necessary or convenient.'  (Prob. Code, § 1514, subd. (a).)"  (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1122, fn. omitted (*Ann S.*).)  The circumstances of the proposed guardianship may be investigated by a court investigator.  (Prob. Code, § 1513, subd. (a); *Ann S.*, at p. 1122.)  A temporary guardianship may be established pending the appointment of a permanent guardian.  (Prob. Code, § 2250 et seq.; *Ann S.*, at p. 1122, fn. 3.)

"Early authorities held that in contested guardianship cases, parents were entitled to retain custody unless affirmatively found unfit.  [Citation.]  However, the unfitness standard fell out of favor and the best interest of the child, as determined under the custody statutes, became the controlling consideration.  [Citations.]  The Probate Code now specifies that the appointment of a guardian is governed by the Family Code chapters beginning with sections 3020 and 3040."  (*Ann S.*, *supra*, 45 Cal.4th at pp. 1122–1123; see Prob. Code, § 1514, subd. (b)(1).)

"Family Code section 3020, subdivision (a) declares that 'the health, safety, and welfare of children shall be the court's primary concern in determining the best interest of children when making any orders regarding the physical or legal custody or visitation of children.'  Under Family Code section 3040, subdivision (a), parents are first in the order of preference for a grant of custody, but 'the court and the family' are allowed 'the widest discretion to choose a parenting plan that is in the best interest of the child.'  (Fam. Code, § 3040, [former] subd. (b).)"  (*Ann S.*, *supra*, 45 Cal.4th at p. 1123.)

Section 3041 generally precludes an award of custody to a nonparent over a parent's objection unless the trial court finds by clear and convincing evidence that granting custody to the parent would be detrimental to the child and that granting custody to the nonparent is required by the child's best interest.  (§ 3041, subds. (a) & (b).)  "As used in this section, 'detriment to the child' includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of

26.

the child's parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment does not require a finding of unfitness of the parents." (§ 3041, subd. (c).) If the court finds the person to whom custody may be given already has assumed the day-to-day role of the parent of the minor, as described in subdivision (c), *ante*, "this finding shall constitute a finding that the custody is in the best interest of the child and that parental custody would be detrimental to the child absent a showing by a preponderance of the evidence to the contrary." (§ 3041, subd. (d).)

"When the court appoints a guardian, the authority of the parent 'ceases.' [Citation.] The court has discretion to grant visitation [citation], but otherwise parental rights are completely suspended for the duration of a probate guardianship [citation]. The guardian assumes the care, custody, and control of the child." (*Ann S.*, *supra*, 45 Cal.4th at pp. 1123–1124.) Once established, either voluntarily or involuntarily, a permanent guardianship continues until it is terminated. (*Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51, 61.) This occurs when the ward attains majority, dies, is adopted, or becomes emancipated. (*Ibid.*; Prob. Code, § 1600.) In addition, on petition of the guardian, parent, or ward, the court may terminate the guardianship if it determines termination is in the ward's best interest. (Prob. Code, § 1601.)

An order appointing a guardian is reviewed for abuse of discretion. (*Guardianship of Morris* (1951) 107 Cal.App.2d 758, 762–763.) When applying this standard of review, the superior court's "findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.) Thus, " ' "[t]he abuse of discretion standard measures whether, given the established evidence, the lower court's action 'falls within the permissible range of options set by the legal criteria.' [Citation.]" ' [Citations.] We do not defer to the trial court's ruling when there is no evidence to

27.

support it." (*Robbins v. Alibrandi* (2005) 127 Cal.App.4th 438, 452.) However, " ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.] The burden is on the complaining party to establish abuse of discretion. [Citations.] The showing on appeal is insufficient if it presents a state of facts which simply affords an opportunity for a difference of opinion." (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682.)

As for mother's contentions that certain statutes under the Probate Code are unconstitutional, the constitutionality of statutes is a question of law, which we review de novo. (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 642.) We review the trial court's rulings on the admissibility of evidence for abuse of discretion. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431.)

Mother asks us to review the entire matter de novo on the ground she was deprived of her fundamental right to parent. While mother is correct that she has a fundamental right "to make decisions concerning the care, custody and control of [her] children" (*Troxel v. Granville* (2000) 530 U.S. 57, 66), application of the clear and convincing standard of proof is sufficient "to protect the fundamental rights of parents in all cases involving a nonparent's bid for custody" (*Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 421).

We note that in reviewing mother's claims of error, our review is constrained by a basic precept of appellate law—while appellants must raise in the trial court any issue they wish to have an appellate court consider, mother did not raise in the probate court any question presented on appeal.

"Points not raised in the trial court will not be considered on appeal." (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486; *Dimmick v. Dimmick* (1962) 58 Cal.2d 417, 422; *Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 853 [constitutional questions are forfeited in civil cases if not first raised in trial court]; see *In re Cavanaugh*

28.

(1965) 234 Cal.App.2d 316, 321 [claims of trial judge bias or prejudice forfeited if not raised before matter submitted for decision in trial court]; see also Evid. Code, § 353, subd. (a) [erroneous admission of evidence forfeited unless record discloses the issue was properly raised in the trial court].)  "Even a constitutional right must be raised at the trial level to preserve the issue on appeal." (*In re Marriage of Fuller* (1985) 163 Cal.App.3d 1070, 1076; accord, *United States v. Olano* (1993) 507 U.S. 725, 731.)

" 'The rule is founded upon considerations of practical necessity in the orderly administration of the law and fairness to the court and the opposite party, and upon the principles underlying the doctrines of waiver and estoppel.' " (*Glendale Unified School District v. Vista del Rossmoyne Co.* (1965) 232 Cal.App.2d 493, 496; accord, *People v. Saunders* (1993) 5 Cal.4th 580, 590.)  The "general rule is especially true when the theory newly presented involves controverted questions of fact or mixed questions of law and fact." (*Panopulos v. Maderis* (1956) 47 Cal.2d 337, 341.)  An exception:  When the question is one of law only and is based on undisputed facts, an appellate court has discretion to consider the issue for the first time on appeal.  (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742; *Gilliland v. Medical Board* (2001) 89 Cal.App.4th 208, 219.)

Mother's self-represented status does not relax either our discretion or the permissible scope of our review.  Neither may we hold litigants in propria persona to a different standard than we hold attorneys.  (Cf. *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 985 ["requiring or permitting exceptional treatment of parties who represent themselves would lead to a quagmire in the trial courts, and would be unfair to the other parties to litigation"].)  While a litigant has a right to act as her own attorney, in doing so, she " ' "should be restricted to the same rules of evidence and procedure as is required of those qualified to practice law before our courts; otherwise, ignorance is unjustly rewarded." ' " (*City of Los Angeles v. Glair* (2007) 153 Cal.App.4th 813, 819, disapproved on another ground in *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124, 134–135 & fn. 4.)

Keeping these principles in mind, we turn to mother's claims.

## II.     Notice of Temporary Guardianship Hearing

As we have stated, Probate Code section 2250, subdivision (a)(1) allows a party petitioning for appointment of a guardian to also petition for appointment of a temporary guardian.  Here, grandmother petitioned for temporary guardianship and asked the probate court to rule on her petition without notice to mother based on grandmother's concern mother would hide the boys or remove them from the county.  The probate court granted both her request and her petition.  Grandmother retained temporary guardianship of the boys until the probate court granted her petition for permanent guardianship.

Probate Code section 2250, subdivision (e)(1) requires that notice of the hearing on the petition for temporary guardianship be given to the parents at least five court days before the hearing "[u]nless the court for good cause otherwise orders."  Mother contends this subdivision is unconstitutionally vague because it does not state what constitutes "good cause," citing the principle a criminal law may be invalidated for vagueness when it fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits."  (*City of Chicago v. Morales* (1999) 527 U.S. 41, 56; *Sessions v. Dimaya* (2018) 138 S.Ct. 1204, 1212 ["void-for-vagueness doctrine" applied to criminal statutes "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes"].)  She further argues that even if "good cause" is sufficiently defined, it was applied to her in a manner that deprived her of her due process rights.

We need not decide the issue, however, because orders granting letters of temporary guardianship are not appealable.  (Prob. Code, § 1301, subd. (a).)  Accordingly, mother may not raise on appeal issues regarding notice of the temporary guardianship.[10]  Moreover, even if the probate court erred in dispensing with notice, the

---

[10]     We note the Judicial Council adopted a rule of court that establishes uniform standards for good cause exceptions to the notice requirement, as required by Probate Code section 2250, subdivision (k).  Rule 7.1012 of the California Rules of Court states

issue was rendered moot when the probate court granted grandmother's petition for guardianship.

## III. Constitutionality of Probate Guardianships

Mother contends that because guardianship proceedings involve the potential loss of parental rights, the proceeding below was a criminal or quasi-criminal matter that, at a minimum, gave her the rights to confront witnesses and secure an attorney. Mother asserts she was deprived of those rights when she was unable to confront Marcie and "was tricked" into agreeing Marcie was an unavailable witness. She also asserts the hearsay exception for an unavailable witness was improperly applied because grandmother did not exercise diligence in attempting to have Marcie's declaration authenticated and the declaration was not credible. Mother asks us to either: (1) "strike down a severable portion of the [P]robate [C]ode and all case law standing for the proposition that a parent loses constitutional defendant rights simply because the case against them is stylized as a guardianship proceeding, rather than a Dependency Court or Family Law proceeding"; or (2) establish a Probate Code guardianship proceeding that "carries with it the right to secure an attorney, and the right to confront one's accuser."

We decline mother's invitation. First, mother does not identify what portions of the Probate Code she contends are unconstitutional. She cites only Probate Code section 1516.5, subdivision (a), which allows for the termination of parental rights after the child has been in the guardian's physical and legal custody for two years and the court finds the child would benefit from being adopted by the guardian, considering all factors

the rule provides uniform standards for the good cause exception to the notice requirement and provides that good cause "must be based on a showing that the exception is necessary to protect the proposed ward or his or her estate from immediate and substantial harm." (Cal. Rules of Court, rule 7.1012(a) & (b).) The rule lists five situations in which good cause may be shown, including, as applicable here, harm that a person entitled to notice might do to the proposed ward if notice is given, including abduction. (*Id.*, rule 7.1012(d).)

31.

relating to the child's best interest, including the nature and extent of the parties' relationships. Our Supreme Court, however, has held this section is facially constitutional, even though it does not require a current showing of parental unfitness. (*Ann S.*, *supra*, 45 Cal.4th at pp. 1118–1119.) Moreover, this statute is inapplicable to mother, as there has never been an adoption proceeding and her parental rights have not been terminated. Instead, as the probate court informed mother, her rights had merely been suspended and may be reinstated on evidence restoring the probate court's confidence in her. While guardianship proceedings offer fewer protections for parental interests than dependency proceedings, as explained in *Guardianship of Christian G.* (2011) 195 Cal.App.4th 581, 596–602, she cites no authority for the proposition that guardianship proceedings should be treated as criminal or quasi-criminal matters.

Mother's complaints appeared focused on her lack of an attorney and the inability to confront and examine Marcie. With respect to the right to secure an attorney, mother was given the opportunity to obtain one, but she decided against it. Thus, mother was not deprived of counsel. To the extent she is claiming she was entitled to a court-appointed attorney, she did not request one and even if she had, declining to appoint one does not, of itself, violate due process. (*Guardianship of H.C.* (2011) 198 Cal.App.4th 1235, 1245–1246.)

While mother did not have an express constitutional right to confront and examine witnesses as that right is confined to criminal proceedings, "in civil proceedings a party has a due process right under the Fifth and Fourteenth Amendments to the federal Constitution to cross-examine and confront witnesses." (*In re Mary S.* (1986) 186 Cal.App.3d 414, 419; *David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 777.) But, as we have stated, a party who does not timely assert their rights, even constitutional ones, forfeits them. (*People v. $17,522.08 United States Currency* (2006) 142 Cal.App.4th 1076, 1084 [right to a jury trial].) "A party on appeal cannot successfully

complain because the trial court failed to do something which it was not asked to do."
(*Farmer Bros. Co. v. Franchise Tax Bd.* (2003) 108 Cal.App.4th 976, 993.)

Here, mother never objected to the admission of Marcie's declaration on any ground, let alone a constitutional one. Mother contends she was deprived of her right of confrontation because the probate court improperly admitted and relied on evidence she hired Marcie to take the hair follicle tests on her behalf, namely, Marcie's declaration and attached exhibits, as well as the Facebook and text messages. She asserts the declaration is inadmissible hearsay and was never authenticated, and there was insufficient evidence Marcie was an unavailable witness. Mother further argues Marcie's declaration does not bear the indicia of reliability because it does not state Marcie was willing to testify and the alleged Facebook and text messages were not attached to it or mentioned in it. Mother asks us to strike Marcie's declaration and all evidence attributed to her as hearsay and lacking foundation.[11]

We are constrained, however, by mother's failure to object to this evidence on any of these bases. As mother admits, she agreed Marcie was an unavailable witness. While she claims she was tricked into making this agreement, there is no evidence in the record to support this contention. Mother also contends it "is legally impossible for the parties to stipulate to 'unavailable witness' in the constitutional sense." But she does not cite any authority to support this contention.

Mother asserts as a self-represented party, she could not be expected to understand what an unavailable witness finding meant or that the probate court was going to admit

---

[11] Mother notes the Facebook and text messages are not in the appellate record. She fails to recognize that it is the appellant's responsibility to provide an adequate record on appeal. (See *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296 [to overcome presumption on appeal that an appealed judgment or order is presumed correct, appellant must provide adequate record demonstrating error].) When her attorney completed the notice designating the record on appeal, he did not designate any exhibits to be included in the clerk's transcript.

otherwise inadmissible hearsay for the purpose of terminating her fundamental right to custody. But as we have explained, it is well established that "[i]n propria persona litigants are entitled to the same, but no greater, rights than represented litigants and are presumed to know the [procedural and court] rules." (*Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 795.)

Mother's failure to raise the issues she now claims bar admission of Marcie's declaration and supporting evidence, such as whether grandmother used diligence to obtain Marcie's testimony and whether Marcie's declaration bore an indicia of reliability, precludes our review of these claims, as any argument concerning admissibility of evidence survives review on appeal "only if the record showed that the appropriate objection was made and rejected." (*Broden v. Marin Humane Society* (1999) 70 Cal.App.4th 1212, 1227; Evid. Code, § 353, subd. (a).)

## IV. The Expert Witness

Mother contends we should strike Steven's testimony about the alleged Facebook and text messages because: (1) Steven was not properly designated as an expert since there was no exchange of expert witness information as provided in Code of Civil Procedure section 2034.210;[12] (2) he did not comply with the *Kelly/Frye* standard because he was not a communications technology expert and did not examine the actual electronic communications;[13] (3) the secondary evidence rule of Evidence Code

---

[12]    Code of Civil Procedure section 2034.210 provides that a party may obtain discovery by demanding all parties simultaneously exchange information concerning their expert trial witnesses, while Code of Civil Procedure section 2034.260, subdivisions (b) and (c) set out what must be included in the exchange of expert witness information. These statutes do not apply here, as neither mother nor grandmother demanded discovery concerning expert witnesses.

[13]    "Under the *Kelly-Frye* rule, evidence based on a new scientific method of proof is admissible only upon a showing that the procedure has been generally accepted as reliable in the scientific community in which it was developed. [Citations.] The test is usually applied to novel devices or processes involving the manipulation of physical evidence …." (*In re Amber B.* (1987) 191 Cal.App.3d 682, 686, citing *People v. Kelly*

34.

section 1521 required production of the electronic devices or, at a minimum, the actual phone and Facebook records;[14] and (4) he "failed to disclose a fatal conflict of interest, i.e. that he is the husband of [grandmother]'s counsel."

On the last contention, Steven did disclose he was Aitchison's husband at the outset of his testimony. While mother objected at one point to Steven's testimony on the ground he did not have personal knowledge regarding cellphones, mother failed to object on the ground that Steven had a conflict of interest or on any of the other grounds she now raises. Accordingly, she forfeited her claims of error with respect to Steven's testimony.

## V.    The Award of Guardianship to Grandmother

Mother contends that even if she used drugs and defrauded the probate court by hiring a person to take the hair follicle tests, there was insufficient evidence to justify an award of guardianship to grandmother. Specifically, mother asserts that defrauding the court is an offense against the court, not the children, and therefore should not be considered in determining her parental fitness. Mother reasons that when the basis for the probate court's custody decision is removed, that leaves only the finding she "used drugs one time and *nothing else*." She argues that under section 3041.5, a positive test result cannot by itself constitute grounds for an adverse guardianship decision, and to award custody adverse to her, the probate court was required to find she engaged in the habitual, frequent or continual illegal use of controlled substances or was convicted for

---

(1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.) The rule would not apply here, as Steven's testimony did not involve a new scientific method of proof.

**14**     Evidence Code section 1521 is the Secondary Evidence Rule and provides that "[t]he content of a writing may be proved by otherwise admissible evidence." (Evid. Code, § 1521, subds. (a) & (d).) Steven's testimony, however, was not used to prove the content of the Facebook and text messages or the emails, but rather to prove that these items were not fabricated.

the illegal use or possession of a controlled substance, neither of which was supported by the evidence.[15]

First, the probate court made clear it did not order mother to submit to hair follicle testing. If it had, it would have erred, since the federal standards California courts are required to follow in section 3041.5 only allow the court to order urine tests. (*Deborah M. v. Superior Court* (2005) 128 Cal.App.4th 1181, 1193–1194.) Since the probate court did not order mother to drug test, section 3041.5 does not apply here and, contrary to mother's argument, the probate court was not required to determine whether mother engaged in "the habitual, frequent, or continual illegal use of controlled substances." (§ 3041.5.)

Mother's assertion the probate court relied solely on a presumed positive drug test in granting grandmother guardianship is without merit. The probate court stated it was not relying on a single positive test, but rather multiple positive tests, as well as its finding mother defrauded the court by submitting false evidence of negative hair follicle tests, which caused it to terminate the prior guardianship and showed mother was not prepared to have custody of the boys. While mother contends her offense, if any, was

---

**15** As relevant to mother's arguments, section 3041.5 provides: "In any … guardianship proceeding brought under the Probate Code, the court may order any person who is seeking custody of, or visitation with, a child who is the subject of the proceeding to undergo testing for the illegal use of controlled substances … if there is a judicial determination based upon a preponderance of evidence that there is the habitual, frequent, or continual illegal use of controlled substances … by the … person seeking guardianship, or person seeking visitation in a guardianship. This evidence may include, but may not be limited to, a conviction within the last five years for the illegal use or possession of a controlled substance. The court shall order the least intrusive method of testing for the illegal use of controlled substances … by … the … person seeking guardianship, or person seeking visitation in a guardianship. If substance abuse testing is ordered by the court, the testing shall be performed in conformance with procedures and standards established by the United States Department of Health and Human Services for drug testing of federal employees…. A positive test result … shall not, by itself, constitute grounds for an adverse custody or guardianship decision…."

against the court, not the children, paying someone to take a drug test in mother's place in order to get the court to terminate a guardianship shows not only poor judgment, but mother's inability to be open about her drug use, which could have a negative effect on the boys if they were placed with her. The juvenile court reasonably could find it would be detrimental for mother to have custody of the boys and granting custody to grandmother, who had been the boys' guardian for nearly three years before guardianship was terminated in March 2019, would be in their best interest.

## VI.      Consideration of Father's History of Domestic Violence

Mother asserts the probate court failed to consider that father had been recently convicted of domestic violence against mother and both a criminal protective order and family law domestic violence restraining order were issued against him. She further asserts the probate court knew father lived with grandmother, yet it failed to presume it would be against the boys' best interest to live with father as required by section 3044. She argues had it properly followed section 3044,[16] the probate court would have made the required presumption and never awarded custody to grandmother, at least without some effort to rebut the mandatory presumption. On this basis, she asks us to grant her petition to terminate the guardianship.

Section 3044 establishes a rebuttable presumption that it is not in the child's best interest to award joint or sole legal or physical custody to a parent who a court has found to have committed domestic violence against the other parent within the previous five

---

[16]      Mother also cites section 3011, subdivision (a), which provides, in pertinent part, that "[i]n making a determination of the best interests of the child in a proceeding described in Section 3021, the court shall … consider all of the following:  [¶] … [¶] (2)(A) A history of abuse by one parent or any other person seeking custody against any of the following:  [¶] … [¶]  (ii) The other parent."  Section 3011, however, does not appear to provide to probate guardianship proceedings, as such proceedings are not listed in section 3021.  Moreover, father was not the party seeking custody of the boys.

years.  (§ 3044, subds. (a), (d)(2).)  By its terms, it applies when a party is seeking custody of the child.  (§ 3044, subd. (a).)

The domestic violence restraining order certainly constitutes a court finding that father committed domestic violence against mother.  (See *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1267 ["a finding of domestic abuse sufficient to support a [Domestic Violence Prevention Act] restraining order necessarily triggers the presumption of section 3044"].)  The statutory presumption is not triggered, however, because father was not seeking custody of the boys.  While mother claims the probate court effectively gave custody to father when it gave grandmother custody because the two live together, there is no evidence in the record father was living with grandmother.  For this reason, we reject mother's claim.

## DISPOSITION

The December 30, 2019 order is affirmed.  Costs on appeal are awarded to respondent.

DE SANTOS, J.

WE CONCUR:

MEEHAN, Acting P.J.

SNAUFFER, J.

38.